In re George Bryce **RAPPLEYE**, Debtor.

Marilyn **JOHNSON**, Plaintiff,

v.

George Bryce **RAPPLEYE**, Defendant.

Bankruptcy No. 95–60100.
Adversary No. 95–6025.

United States Bankruptcy Court,
W.D. Missouri,
Southern Division.

May 28, 1997.

338

J. Kevin Checkett, Checkett & Pauly, Carthage, MO, for Plaintiff.

Dan R. Nelson, Fitzsimmons, Schroeder & Nelson, Springfield, MO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

KAREN M. SEE, Bankruptcy Judge.

Defendant–Debtor George Bryce Rappleye filed a Chapter 7 petition seeking to discharge, among other debts, obligations owed to his former wife, plaintiff Marilyn Johnson, as a result of a Decree of Dissolution of Marriage entered by a Utah state court. Plaintiff filed a timely complaint to determine dischargeability of debt pursuant to 11 U.S.C. § 523(a)(5) and (15). Appearances at trial were: Plaintiff, in person and by counsel J. Kevin Checkett; Debtor, in person and by counsel Dan Nelson. After hearing the evidence and arguments, the court finds Debtor's obligations to Plaintiff are nondischargeable. The court has jurisdiction over this core proceeding and may enter final orders pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(A),(I),(J) and (O).

These findings and conclusions are consistent with those made on the record at the end of the hearing and in a supplemental record, which shall be incorporated herein, but due to additional review of the record, they may modify oral findings. Any findings of fact designated in error as conclusions of law shall be deemed findings of fact; any conclusions of law designated in error as findings of fact shall be deemed conclusions of law.

## FACTUAL BACKGROUND

These parties married in their fifties and divorced after approximately five years. Plaintiff had been married previously for more than 20 years to a doctor in the Air Force. She and her former spouse had six children. In the dissolution of that marriage, Plaintiff received a modest pension of $1,180 per month.

Prior to Debtor's 1995 bankruptcy filing in Missouri, the Fourth Judicial District Court of Wasatch County, Utah entered a Decree of Dissolution of Marriage between Debtor and Plaintiff in 1991. Pursuant to the Decree, Debtor was to pay a total of approximately $206,000 to Plaintiff, including $5,000 for Plaintiff's attorney's fees. Debtor failed to pay any of these obligations.

During the marriage of Plaintiff Marilyn Johnson and Debtor George Rappleye, which lasted only about five years, the parties had both separate and joint property, and separate property which was commingled and converted to joint or marital property. For example, at the time of the marriage Debtor owned a hardware store. When Debtor and Plaintiff married, Plaintiff cashed in her Air Force pension benefit, her primary asset, and contributed the $50,000 in proceeds to the hardware business that she and Debtor jointly operated during their marriage. In the dissolution of marriage proceedings, the state court judge found the hardware business was marital property. As will be discussed below, the business was lucrative.

During the marriage, plaintiff was unemployed except for her work without salary in the hardware store. As found in the dissolution proceeding, she was 55 years old and had limited education, training and job experience. Before the marriage, she had $1,180.00 per month income from the Air Force pension that she cashed in and contributed to the hardware store. At and after the dissolution, Plaintiff's income was only $800 per month. In contrast, Debtor was 56, in good health, and had years of business and work experience. He owned at least two lucrative businesses, including the hardware store (which the state court held had been converted to marital property) and a hosiery business in California. In the dissolution, he

received one half of the proceeds of sale of the hardware business, which totaled approximately $182,000. He had retired and was not gainfully employed, but in order to pay his monthly expenses of $1,875.00, he could look to the hardware store sale proceeds and income of $25,000 per year from the hosiery business. When Debtor began the hardware business in 1981, before the marriage, he earned $15,000 per year from the business, and could earn at least that much and most likely significantly more based on his experience and knowledge, as found by the Utah state court. In 1992, after the dissolution proceeding, Debtor's income was $78,752.00. After that, his income allegedly dropped to virtually zero when he became a stake missionary.

The state court divided the hardware store proceeds of approximately $182,000 equally and entered the judgment for it as alimony, divided an account evenly so that Plaintiff received $58,000, and awarded her attorney fees. It also appears Plaintiff was awarded $800 per month support for two years. Debtor appealed the decision, which was substantially affirmed, and then retried the matter. During the proceedings, Debtor made a fraudulent transfer of real property to his son, which the court voided. In violation of the court's order, Debtor dissipated a Merrill Lynch account by writing checks to family members and friends. At one time, it appears the account had in excess of $300,000.

Debtor and Plaintiff are both members of the Mormon church, and Debtor now lives in Branson, Missouri, where he has volunteered to serve as a full-time lay missionary, known as a "stake missionary." This position produces no income, and Debtor claims he now has no income and lives off the charity of friends. Plaintiff works as a church secretary and rents out a room in her home for extra income.

On February 13, 1995, Debtor filed a Chapter 7 bankruptcy seeking discharge of his debts, including that owed to Plaintiff, which was listed in the schedules at $216,011.47. Other than the debt to plaintiff, most of the other scheduled debts were for attorney fees to numerous attorneys. In addition, two friends, Brandy and Charles Nichol, were listed with two unspecified claims totaling $11,200.00. At trial, Debtor testified the Nichols' debts were for helping him prepare court documents.

## DISCUSSION

### 1. Dischargeability under § 523(a)(5)

■ 11 U.S.C.A. § 523(a)(5)(1994) provides, in pertinent part, that:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\*    \*    \*    \*    \*    \*

(5) to a ... former spouse ... of the debtor, for alimony to, maintenance for, or support of such spouse ... in connection with a separation agreement, divorce decree or other order of a court of record....

The issues to be decided before this court are judged by the standard of preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ The evidence indicates the awards made to Plaintiff and ordered to be paid by Debtor were intended as support. While the court does not disregard the Decree Of Dissolution Of Marriage issued by the Utah state court, nothing in the Decree is conclusive on the issues tried by the Bankruptcy Court. *See In re Williams*, 703 F.2d 1055 (8th Cir.1983); *In re Ianke*, 185 B.R. 297 (Bankr.E.D.Mo.1995). A statement in a decree of dissolution of marriage that neither party is awarded support is not a limiting factor binding on the bankruptcy court. *See, Holliday v. Kline*, 65 F.3d 749 (8th Cir.1995); *In re Williams*, 703 F.2d 1055 (8th Cir.1983). This court's findings are consistent with the findings of the Fourth Judicial District Court of Wasatch County, Utah.

■ The doctrine of collateral estoppel prevents relitigation of an issue in a later lawsuit by the party against whom the issue was decided in the previous adjudication. *Swapshire v. Baer*, 865 F.2d 948, 950 (8th Cir.1989). The elements of collateral estoppel are: 1) the issue decided in the prior adjudication is identical to the issue in the

present case; 2) the prior adjudication resulted in a judgment on the merits; 3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior lawsuit; and 4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the previous suit. *Swapshire*, 865 F.2d at 951, *citing Oates v. Safeco Ins. Co. of America*, 583 S.W.2d 713 (Mo.1979). The elements of collateral estoppel are satisfied in the present case regarding the support nature of the award.

The issues in this adversary action as to division of marital property and debts, and determination of awards in the nature of support, are the same as those comprehensively and thoroughly litigated throughout the Utah court system by these same parties. Plaintiff presented credible testimony and evidence before this court that the exhibits presented and accepted into evidence in this proceeding were used before the courts in Utah to determine the support issue. The decision by the District Court of Wasatch County, Utah on retrial, which was a decision on the merits, makes clear that the obligations of Debtor to Plaintiff were for her support. Debtor had a full and fair opportunity to litigate all the issues in the Utah state courts, and in fact has availed himself of the opportunities to engage in extensive litigation in Utah.

■ Even without the benefit of the doctrine of collateral estoppel, this court's ruling in favor of Plaintiff and against Debtor would be the same. The court has considered the numerous factors set forth in *In re Soval*, 71 B.R. 690, 692 (Bankr.E.D.Mo.1987), in determining the dischargeability under § 523(a)(5) of the debt owed Plaintiff by Debtor. Plaintiff has met the burden of proof under the *Soval* analysis to show that the obligations ordered by the Utah court to be paid by Debtor to Plaintiff or for her benefit were intended to have a support function and are, therefore, nondischargeable obligations under § 523(a)(5) of the Bankruptcy Code.

Particularly noteworthy is the fact that Plaintiff has poor earning capacity and is not employed at the same job she held at the time of the Utah retrial. The Utah court did not believe Plaintiff had a surplus of funds by which she could support herself. Debtor, on the other hand, has business experience and has had at least two businesses that have generated substantial profits. Debtor's earning capacity is actually much greater than that found by the Utah court: During Debtor's life, he has generated a significant amount of income and assets.

### 2. Dischargeability under § 523(a)(15)

■ The obligations are also nondischargeable pursuant to § 523(a)(15) of the Bankruptcy Code. 11 U.S.C.A. § 523(a)(15)(1994) provides, in pertinent part, that:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (15) . . . that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record . . . unless—
>
>> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor . . .; or
>>
>> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a . . . former spouse. . . .

Under the provisions of § 523(a)(15), the burden is on Debtor to show either his inability to pay the joint indebtedness or to show that the benefit to Debtor of receiving a discharge of these debts outweighs the detriment to Plaintiff from Debtor's non-payment of the debts. *See, In re Becker*, 185 B.R. 567 (Bankr.W.D.Mo.1995). Debtor has made no such showing under either prong.

■ *In re Florio*, 187 B.R. 654, 656–658 (Bankr.W.D.Mo.1995), is adopted by this court for the proposition that the ability to pay under § 523(a)(15) does not necessarily mean at the time of the trial, but requires the court to consider debtor's future earning

capacity. Here, Debtor has voluntarily placed himself in a position of earning less income— virtually no income, in fact— and then claims he is unable to pay his debts. Debtor's decision to become a stake missionary in his church is his decision alone.[1] He chose to place himself in a position of voluntary retirement several years ago. Debtor receives no compensation from his church. Taking a voluntary retirement and working in a voluntary position for the church or a charitable or civic institution is a luxury many people would like to be able to afford. Debtor is not prohibited from making such life-choice decisions, but he cannot do so in order to render himself a pauper in an effort to avoid the lawful support obligations ordered by the Utah dissolution court, or while seeking the protection of the bankruptcy court as a means to avoid those support obligations. When the obligations to Plaintiff are satisfied, Debtor is free to make such life-choices.

Debtor raised medical issues as a reason it would be more detrimental to him to enforce the obligations and why he could not pay the obligations. Debtor presented no expert testimony or medical evidence of such conditions and there is no evidence Debtor is disabled or is in any manner unable to work. The court observed Debtor during a period of two days and he appeared fit and fully able to function, which he apparently does in his full-time volunteer endeavor. Although Debtor claims to have disc problems, many people have such back problems and are able to get along with their daily lives and employment. In fact, Debtor is an avid golfer and continues to play golf in spite of his claimed disability. Additionally, Debtor is able to perform his full-time job as a voluntary stake missionary, his normal daily activities, and odd jobs. Debtor did not establish an inability to pay sufficient to satisfy the first prong of § 523(a)(15).

Analysis of the second prong of § 523(a)(15) indicates the detriment to Plaintiff outweighs the benefit of discharge to the Defendant. As previously noted, Plaintiff does not have significant earning capacity. By contrast, Debtor has years of business experience and has had at least two lucrative businesses that have made substantial profits. He has previously generated significant income and assets. Debtor has greater income capacity but chooses not to work. Plaintiff also at one time wished to be a volunteer missionary, but instead now works as a church secretary and rents out a room in her home to meet ordinary living expenses. Debtor suggests that Plaintiff should look to her children for support, but Debtor's support obligations are not discharged by any acts of charity from Plaintiff's children.

### 3. Debtor's Credibility

Debtor's previous lack of honesty and deceptive actions reflect on his credibility. Plaintiff testified that, during the marriage, Debtor kept significant sums of cash hidden in the home. Once, she unexpectedly came across $52,000 in cash hidden inside the bathroom cabinet behind the drawers. Debtor told her at that time the cash was taken from the register (and apparently was not reported to tax authorities) at the hardware store the couple owned. This testimony was basically undisputed. The couple took their personal problem over Debtor hiding money from his spouse to their bishop. Plaintiff and Debtor apparently split the $52,000 after their bishop advised them to do so.

The District Court of Wasatch County found Debtor made at least one fraudulent transfer within his family. The court voided that transfer. The state court prohibited Debtor from disbursing funds, yet in violation of that order, Debtor made a transfer of $6,000 to $10,000 to his children out of the

---

**1.** Debtor testified that if the stake president asked a person to volunteer to be a stake missionary, it was actually a command or request that one did not decline. Debtor testified he was asked to do this by the stake president, but he could not remember the president's name. Plaintiff's counsel questioned Plaintiff about whether Debtor was called by the stake president to be a stake missionary or whether he volun-

teered. Debtor's objection to the question was sustained. However, it appears the testimony should have been admitted because Debtor introduced the issue and relied on hearsay testimony to assert the stake president asked him to be a stake missionary. Therefore, Plaintiff should have been allowed to testify that the stake president informed her he did not ask Debtor, but that Debtor volunteered for mission work.

funds. He made the transfer because Plaintiff made a gift of money to her children before the divorce. Plaintiff testified the transfer to her children was from her half of the hidden $52,000 the bishop split between the parties. In contrast, Debtor's transfers to his family members and children after initiation of the dissolution proceedings were made from the marital assets Debtor had been enjoined from disbursing. Whether there was a specific order in effect from the state court judge at that time, one would know generally in a divorce proceeding where assets are being divided that it is improper to take assets and convey them to family members. If Debtor conveyed marital assets in order to keep them out of Plaintiff's reach, the conveyance constituted a fraudulent transfer.

Evidence came in without objection that in 1984, Debtor was indicted in federal court in Wyoming for actions involving commercial fraud. Debtor and a third party attempted to obtain funds from a bank in payment for bogus merchandise orders to the third party. Debtor would apparently receive a check from the bank and then sign a lien waiver, which he then sent back to the bank. No merchandise was delivered, so the lien waiver was essentially false. The court notes that the information came into evidence without objection. The case did not go to trial and there was no conviction because Debtor entered into a pretrial diversion agreement wherein he was put on probation for one year and required to pay restitution of $25,000. Pursuant to the diversion agreement, if at the end of that time Debtor had complied with the agreement, the charges would be dismissed. Debtor was not prosecuted because he made restitution and complied with the other requirements of the agreement.

There was also evidence that Debtor forged Plaintiff's name on at least two occasions, once to a check and once to a document that released Plaintiff's money from a Merrill–Lynch bank account. In regard to the check, the court notes that a photocopy of the check was produced at trial and it was not possible to determine from the copy whether it was her signature or a copy of her signature. The questions asked by Debtor's attorney in regard to the checking account, however, did not directly dispute that there had been a transfer out of the bank account. The questions went to whether there had been any ultimate or permanent loss incurred because of the check written out of the account. Plaintiff, on the other hand, was not trying to establish that there had been an ultimate loss, but that there had been a tendency to make false transactions, to forge names and to engage in fraudulent activity. The $30,000 from the allegedly forged check was later returned to her account, which was a joint account with Debtor. Plaintiff indicated that Debtor was the only other person who had access to the checks and who could have forged her name. The court makes no specific finding that a forgery occurred, based upon the earlier reference about the photocopy of the check, but notes there was not a denial it occurred, only testimony that no permanent loss resulted. Plaintiff also testified that during the dissolution proceedings, a real estate lot was transferred to Debtor's son. The transfer was accomplished by Debtor forging his son's name while the son was on an obligatory mission outside the State of Utah.

Debtor's credibility is also suspect in regard to allegations that he lives at this point in his life totally without income and dependent on the charity of others. The court notes Debtor claimed the estimated $450 a month income that he listed in his schedules was, in fact, the value of charitable donations from friends who support him and occasionally allow him to stay at their houses while he engages in his stake missionary work. In examining the other facts in this case, such as Debtor's previous income and his propensity for hiding cash and transferring assets to family members, it appears that Debtor has a pattern and practice of accumulating large amounts of money in forms that are difficult to trace, as evidenced by the $52,000 in cash skimmed from his business. Debtor has a practice of accounting loosely or not at all for such funds. Debtor's allegations that he lives totally without any income and solely on the charity of others is not consistent with the other facts in the case.

An issue arose during Debtor's cross-examination of Plaintiff that shed additional light on Debtor's credibility and motive. Debtor's counsel, after conferring with Debtor, attempted to ask whether Plaintiff had engaged in extensive litigation in her divorce from her first husband. Her first husband was an Air Force doctor and their long-term marriage resulted in six children. After Plaintiff's counsel objected, Debtor's counsel explained that the reason for the question was to show Plaintiff's custom and practice of being a professional litigator or "black widow" who engaged husbands in divorces and then litigated until she got their money. Debtor's argument that Plaintiff had a scheme to bilk innocent men of their assets is ludicrous. In actually applying the argument to Plaintiff's first marriage, the scenario portrayed would be that Plaintiff entered into her first marriage of 20 years, and gave birth to and reared six children while following her spouse from air base to air base, in order to bilk her former spouse of the small pension she was awarded in the dissolution of marriage.

There was absolutely no evidence to support the assertion of any such practice by Plaintiff. The true significance of such a question is the questioner's own motivation. Debtor's question invites examination of his own thinking, his own state of mind and his own actions. In examining all the circumstances leading up to the bankruptcy trial, the court concludes the litigation was protracted and multiplied by Debtor and not by Plaintiff. If there is any custom and practice of being a professional litigator, it is on Debtor's part, as he has taken his case to three different courts in Utah and one Missouri court, all with the consistent result that the courts ruled adversely to Debtor's position. During these protracted judicial proceedings, he dissipated and diverted the marital assets and has avoided paying Plaintiff. Debtor appealed the first decision of the Utah state court. The court of appeals rendered an adverse decision to Debtor, who then went back for a second trial. He eventually filed bankruptcy, again in order to upset the Utah court's decision. By filing the bankruptcy, he forced Plaintiff to file the adversary action to protect the judgment she obtained in

Utah. It is not fair to suggest that Plaintiff has engaged in bad faith litigation because she has been placed in the position of having to protect her judgment which Debtor has tried to take away and which, by devious means and dissipation of assets, he has avoided paying. Moreover, it is just as likely that one could examine Debtor's behavior and conclude that his practice was to enter into a short-term marriage with someone who appeared lonely and vulnerable and had $50,000 so that Debtor could get the money and then leave. The question backfired on Debtor and provided a revealing key to his state of mind.

Debtor's true reasons for contesting his support obligations do not arise from an honest belief that the state court judges were erroneous in their decisions regarding the obligations, or that he is truly unable to pay the obligation and that a discharge would be more beneficial to him than detrimental to Plaintiff. The key to Debtor's true reason for contesting the debt surfaced at the end of examination by his counsel. Debtor was asked a question regarding his purpose in attempting to discharge his obligations to Plaintiff Debtor's answer was spontaneous and damaging. He said that he simply refused to believe judges had the right to distribute any of his assets to Plaintiff because he knew they were his own premarital property. Debtor claimed he was right and the judges were wrong. In effect, Debtor claims to be above the law, a state of mind that is consistent with his previous actions, such as making fraudulent transfers, dissipating assets despite the judge's order, and skimming profits from his business without disclosing the hidden funds either to his spouse or the tax authorities.

Debtor has a strong subjective belief that so far, all the judges who have looked at the case must be wrong because they do not agree with him. The trial and appellate judges in Utah and now the bankruptcy court in Missouri have agreed in their findings against Debtor. At some point, Debtor must realize that, especially where he has sought out the protection of the court, he is bound by that judgment.

**344**

## CONCLUSION

Accordingly, based on the foregoing, it is ORDERED, ADJUDGED and DECREED:

1. Judgment is granted in favor of Plaintiff Marilyn Johnson and against Defendant–Debtor George Bryce Rappleye in the amount of $216,011.47, the amount scheduled in this bankruptcy proceeding, with prepetition and post-petition interest at the rate specified in the decree of dissolution of marriage, or in the absence of such rate in the decree, at the rate provided pursuant to Utah law, plus costs.

2. The judgment entered herein is not dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(5) and § 523(a)(15).