**In re Kevin Hugh KENNARD, Debtor.**

**Freida J. Kennard, Plaintiff,**

**v.**

**Kevin Hugh Kennard, Defendant.**

**Bankruptcy No. 00–61131.**
**Adversary No. 00–6060.**

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

Jan. 29, 2001.

**148**

Timothy J. Harris, Springfield, MO, for plaintiff.

Don A. Willoh, Springfield, MO, for defendant.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Debtor Kevin Kennard's former wife filed this adversary proceeding objecting to the discharge of marital debts pursuant to 11 U.S.C. § 523(a)(5) and (15). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Pro-

1. Pl.Ex. B.

2. Pl.Ex. A.

cedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that the debts are dischargeable.

## FACTUAL BACKGROUND

On October 15, 1999, the Circuit Court of Greene County, Missouri (the Circuit Court) entered its Judgment and Decree of Dissolution of Marriage (the Decree) dissolving the marriage of Kevin and Freida Kennard. They married on March 2, 1988, and have no children together. Freida owned the home in which they resided at the time of the marriage. Thereafter, they refinanced the home by borrowing, in both of their names, the sum of $42,400.05 from Mortgage One Corporation, a/k/a Household Finance Corporation, (HFC1).[1] They used these funds to pay off Freida's mortgage, pay down some debt, and purchase a van. They later borrowed an additional $10,000.00 from Household Finance Corporation, secured by a second Deed of Trust on the real estate (HFC2). The Decree provided that Freida required maintenance, and awarded her the sum of $900.00 to be paid over two months at $450.00 per month. The parties agree that Kevin paid the $900.00. The Decree also provided that Kevin would continue to provide health insurance to Freida until April 13, 2000, and Kevin did so. The Decree then incorporated a Marital Settlement and Separation Agreement (the Agreement) in which the parties dealt with all other property. The Agreement provides that the real estate would become the sole and exclusive property of Freida.[2] Kevin agreed to assign his interest in the real estate, the escrow fund, and any existing insurance, as well as to pay Freida an additional $450.00 in property settlement, as part of the Agreement.[3] The Circuit Court assigned the HFC1 debt in the amount of $41,000.00 to Kevin with pay-

3. *Id.*

ments to begin January 1, 2000. It also assigned one joint credit card debt to Kevin in the amount of $550.00. The Circuit Court assigned the HFC2 debt in the amount of $10,000.00 to Freida. Freida and her son now live in the house, which she values at $35,000.00. The two mortgages total in excess of $50,000.00. Kevin made payments on HFC1 in January and February of 2000, and has made no payments since that time. On July 7, 2000, he filed this Chapter 7 bankruptcy petition seeking to discharge his obligation on HFC1, the joint credit card debt in the amount of $550.00, and the remaining property settlement debt in the amount of $450.00. Freida objected to the discharge of those obligations arguing that Kevin has the ability to pay, and that the detriment to her outweighs the benefit to Kevin of such a discharge.[4] Alternatively, Freida argued that the property awarded to her in the Decree and Agreement is in the nature of maintenance, and is nondischargeable. This Court held a hearing on January 3, 2001. At the hearing, Kevin testified that he has been unable to work as a welder since filing his bankruptcy petition because he suffers from vertigo. The parties agreed to the admission of his treating physician's deposition. I will deal first with the 11 U.S.C. § 523(a)(5) issue.

## DISCUSSION

 Section 523(a)(5) of the Bankruptcy Code (the Code) excepts from discharge debts for maintenance or support:

(a) A discharge under section 727 … of this title does not discharge an individual debtor from any debt—

. . . . .

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a government unit, or property settlement agreement, but not to the extent that—

. . . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.[5]

The party objecting to the dischargeability of certain debts under section 523(a) bears the burden of proving each element of the objection by a preponderance of the evidence.[6] Whether an obligation is in the nature of maintenance or support is a matter of federal bankruptcy law.[7] This Court is not bound by the categorization of the award contained in the state court dissolution decree or by the state law definition of the award.[8] Instead, whether the Circuit Court intended the award to serve the function of maintenance or support is a question of fact to be decided by this Court.[9] In determining the award's intended function, this court will look first to the language used by the Circuit Court.[10]

4. The Complaint also mentions other credit card obligations that were awarded to Kevin in the divorce, but the parties agreed at the hearing that those obligations belonged to Kevin alone, not to Kevin and Freida jointly.

5. U.S.C. § 523(a)(5).

6. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); Fed.R.Bankr.P. 4005

7. *Williams v. Williams (In re Williams),* 703 F.2d 1055, 1056 (8th Cir.1983).

8. *Stamper v. Stamper (In re Stamper),* 131 B.R. 433, 435 (Bankr.W.D.Mo.1991); *Telgmann v. Maune (In re Maune),* 133 B.R. 1010, 1014 (Bankr.E.D.Mo.1991).

9. *Holliday v. Kline (In re Kline),* 65 F.3d 749, 750 (8th Cir.1995); *Adams v. Zentz (In re Zentz),* 963 F.2d 197, 200 (8th Cir.1992).

10. *In re Peterson,* 133 B.R. 508, 512 (Bankr. W.D.Mo.1991). *Grundy Nat'l Bank v. Frank (In re Frank),* 103 B.R. 771, 773 (W.D.Va. 1989).

**150**

The Circuit Court found that Freida was, indeed, entitled to maintenance:

11. That after considering the factors set forth in Section 452.335 RSMo, the Court finds that the respondent requires maintenance. The Court finds that it is reasonable that Petitioner [Kevin] should pay Respondent [Freida] the sum of $900.00 as and for her maintenance, with the first payment of $450 due on November 1, 1999, and the last payment of $450 due on December 1, 1999. The Court further finds that Petitioner should continue to maintain health insurance coverage from Respondent at his expense until April 13, 2000.[11]

It is undisputed that Kevin paid the maintenance and provided the health insurance. The Decree then incorporates the Agreement and states, "[t]he Court divides the marital property and debts as set forth in Exhibit A [the Agreement], and restores to the parties those items of non-marital property as described in Exhibit A."[12] While this Court is not bound by the language of the Circuit Court, Freida had the burden of proving that the Circuit Court intended something other than what the Decree stated. She testified at the hearing that she believed the property division was fair at the time of the divorce. She stated that they used some of the funds from the HFC1 loan to pay off Kevin's debts, so Kevin agreed to assume the HFC1 obligation. Kevin also testified that he retained the value of his 401k plan at the time of the divorce, and that he assumed the HFC1 obligation in order to equalize the property division. The Circuit Court clearly knew how to award maintenance in this case, and it did so. By Freida's own testimony, she believed the assignment of the HFC1 obligation to Kevin to be part of the property division. I find no other evidence of intent to allow me to find that these debts are in the nature of maintenance or support and,

thus, nondischargeable. I will, therefore, find in favor of Kevin as to Court II of the Complaint.

 Count I requests a finding of nondischargeability under section 523(a)(15) of the Code. As to property settlement obligations, that section establishes a rebuttable presumption of nondischargeability. If the nondebtor former spouse can prove that the debt arose from a property settlement, the debt is nondischargeable unless the debtor can prove that he does not have the ability to pay the debts, or that the benefit to the debtor of a discharge is outweighed by the resulting detriment to the former spouse. Section 523(a)(15) reads as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.[13]

**11.** Pl.Ex. A ¶ 11.

**12.** *Id.*

**13.** 11 U.S.C. § 523(a)(15).

As several Courts have noted, section 523(a)(15) contains a shifting burden between the debtor and the plaintiff.[14] The burden of persuasion is on Freida to show that the debts in question arose from a property settlement in connection with a divorce.[15] The burden of going forward then shifts to Kevin, who must prove that he does not have the ability to pay the debts, or, if he has the ability to pay the debts that the benefit to him of a discharge outweighs the detriment to Freida.[16] Neither party disputes that the debts in question here arose from the divorce, therefore, I find that Freida has met her initial burden of persuasion.

Kevin must, thus, prove that he cannot pay the debts. Kevin testified that at the time of the divorce, and at the time of the bankruptcy filing, he worked for Paul Mueller Company (Paul Mueller) as a welder, earning a net income of $2,006.00 per month. According to his bankruptcy schedules, Kevin's average monthly expenses were $2,013.88 when he filed his Chapter 7 petition.[17] The only expense shown at that time that is questionable is a 401k plan loan repayment in the amount of $215.00 per month. Kevin also introduced schedules of his income and expenses as of the date of the hearing.[18] According to those exhibits, and to Kevin's testimony, his net income per month is now $485.44 and his expenses per month are $704.50. Kevin stated that he is unable to work as a welder because he suffers from dizziness. He said he is under the care of a physician, but so far no one has been able to isolate the cause of his dizziness. Nonetheless, he testified that his doctor will not release him to work as a welder, and Paul Mueller will not allow him to work unless he is cleared to work as a welder. He said he periodically checks to see if there are any other less strenuous jobs available at Paul Mueller, but so far nothing else has become available. The parties agreed to the introduction of the deposition of Kevin's treating physician, Dr. Kenneth S. Sharlin. Dr. Sharlin stated that "Kevin does not have any objectively identifiable neurological condition to produce his symptom of vertigo."[19] But, Dr. Sharlin went on to say that "in that general sense that his life has been brought into disorder by symptoms of a neurological or psychological nature, he has a disorder."[20] In other words, Kevin really is experiencing dizziness, whether that dizziness stems from some physical cause or a psychological one. I am aware of a decision in this District that holds that an ability to pay determination is not limited to current income, but must also be based on debtor's future ability to earn income.[21] I am also aware of another decision that relies on a debtor's earning ability, not just her current income.[22] Both of these decisions, however, involve debtors who, after the divorce and

14. *Fellner v. Fellner (In re Fellner)*, 256 B.R. 898, 902 (8th Cir. BAP 2001); *Rush v. Rush (In re Rush)*, 237 B.R. 473, 475 (8th Cir. BAP 1999); *Kirchner v. Kirchner (In re Kirchner)*, 206 B.R. 965, 968 (Bankr.W.D.Mo.1997); *Florio v. Florio (In re Florio)*, 187 B.R. 654, 657 (Bankr.W.D.Mo.1995).

15. *Rush*, 237 B.R. at 475.

16. *Id.*

17. Doc. # 1, Schedule J.

18. Debtor's Ex. 1 and 2.

19. Pl.Ex. Y, pg. 17, ln 25 through pg. 18, ln. 2.

20. *Id.* at pg. 31, ln. 16–19.

21. *See, e.g., Johnson v. Rappleye (In re Rappleye)*, 210 B.R. 336, 340 (Bankr.W.D.Mo. 1997) (holding that a voluntary decision to take a position that pays no income is not determinative if debtor has the ability to earn income sufficient to satisfy the obligations incurred during a divorce).

22. *Florio v. Florio (In re Florio)*, 187 B.R. 654, 657 (Bankr.W.D.Mo.1995) (where the Court held that its "ability to pay" determination was not limited to consideration of income currently earned by debtor, but that the Court could impute income based on wage debtor had earned at a job she voluntarily left).

property settlement, voluntarily gave up jobs that paid enough money for the debtors to satisfy their divorce obligations, and they found jobs that paid little or no money. This case is distinguishable for two reasons. First, I cannot find based on the evidence before me that Kevin had the ability to pay these debts even when he was working as a welder. He was employed full-time when he filed his Chapter 7 petition. According to his schedules he had no disposable income at that time. Paul Mueller was, however, withholding $215.00 per month to repay a loan from his 401k plan. But the HFC1 loan required him to make monthly payments in the amount of $508.44 per month. So, even when Kevin was healthy enough to work, he did not have the ability to pay $508.44 per month.[23] And, given that the loan balance is in excess of $41,000.00, I further find that he neither has any other assets with which to pay the loan, nor is there any basis for finding that he will or could acquire such assets during the term of the loan.

Second, I cannot find that Kevin voluntarily chose not to work in order to avoid paying these obligations. Kevin stated that he has suffered from dizzy spells for a number of years. He also testified that the spells have been increasing in frequency for the past two years. He did not voluntarily give up his job as a welder. His treating physician will not release him to return to work as a welder as long as the dizzy spells continue,[24] and his employer will not allow him to return to work in any other capacity. I find credible Kevin's reasons for not seeking employment elsewhere. He has good health care benefits from Paul Mueller, and he receives disability income as long as he remains an employee. He stated that he realizes he may never be able to work as a welder again, and he has applied for Social Security Disability Income. He is no longer repaying his 401(k) plan loan, and he has fallen behind in his child support payments for his two children from a previous marriage. And, he is no longer able to pay his share of the expenses for the household he shares with his fianceé. While there is no demonstrated physical cause for the dizziness, Dr. Sharlin is unwilling to slate unequivocally that Kevin does not have dizzy spells that prevent him from working as a welder. I find that Kevin does not now have the ability to pay these debts, he did not have the ability when he filed his Chapter 7 petition, and he will not have the ability in the future based either on his income or accumulated estate property.

Since I find that Kevin has neither income nor property with which to pay the mortgage on Freida's house, I need not determine whether the benefit to him of discharging the debt outweighs the harm to her. However, I note her testimony that her expenses exceeded her income even when Kevin was making payments, and also her testimony that the house is worth significantly less than the mortgages against it. While I am aware that Freida is unable to pay the debt due HFC, that fact is not determinative. Since Kevin, the debtor, has demonstrated that he does not have the ability to pay the debt from income or property not reasonably necessary to be expended for his own support, the obligation is dischargeable.

An Order in accordance with this Memorandum Opinion will be entered this date.

---

**23.** The balance as of January 15, 2001, is $40,581.96. Pl.Ex. BB.

**24.** *See* Deb.Ex. 8, pg. 29, ln. 18–21. Dr. Sharlin wrote a letter to Paul Mueller in which he stated, "considering the fact that he is a welder, it would not be wise for him to have these spells while welding."