**In re Lonny Allen BECK and Gina Michelle Beck, Debtors.**

**Ronald M. Grunwald, Plaintiff,**

v.

**Gina Michelle Beck, Defendant.**

**Bankruptcy No. 03–30046–JWV.
Adversary No. 03–03011–JWV.**

United States Bankruptcy Court,
W.D. Missouri.

Aug. 25, 2003.

William H. Perry, III, Joplin, MO, for Debtors.

Norman Rouse, Collins, Webster & Rouse, Joplin, MO, trustee.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

This adversary proceeding comes before the Court on Ronald M. Grunwald's ("Grunwald") Complaint Objecting to Discharge of Debt. Grunwald alleges that a debt owed to him by his former spouse, Gina (Grunwald) Beck ("Beck" or the "Debtor"), is nondischargeable under 11 U.S.C. §§ 523(a)(6) and 523(a)(15), because of allegedly willful and malicious conduct by Beck after a judgment of dissolution of marriage and division of property was entered by the Circuit Court of McDonald County, Missouri. The Court held a trial on this matter in Carthage, Missouri, on July 24, 2003, and took the matter under advisement. The Court has reviewed the pleadings, relevant case law, and the evidence adduced at trial and is now ready to rule. For the reasons set out below, the Court finds that Beck's debt to Grunwald is not excepted from discharge under 11 U.S.C. § 523(a)(6), but is excepted from discharge under § 523(a)(15).

## I. BACKGROUND

Grunwald, forty-nine years old, received his Master's Degree in Food Technology from the University of Arkansas at Fayetteville. After graduation, he worked as a canning manager for a vegetable-based processing plant. On May 13, 1992, Grunwald married Beck, and of that union three children were born. Rather than pursuing his horticultural career, Grunwald went into business with Beck, who was the fifty-one percent owner of S & G Sand & Gravel. Grunwald directed the daily operations of that business. In the course of running S & G Sand & Gravel, Grunwald and Beck incurred numerous secured and unsecured debts. Most prominently, a loan from Corner Stone Bank was secured by a 544A Loader and by Grunwald's personal truck. Like many marriages, the Grunwald–Beck union failed to persevere, and the parties engaged in an acrimonious dissolution proceeding—which resulted in a final decree of dissolution on October 15, 1999. A few days after the decree of dissolution was entered, Beck married her co-debtor in this bankruptcy proceeding, Lonny Allen Beck ("Lonny"), and moved into a three-bedroom ranch-style home with a hot tub, a swimming pool, and occasional maid service.

Under the decree of dissolution, Beck was awarded primary custody of the couple's three minor children, and Grunwald was ordered to pay child support. Neither Grunwald nor Beck was awarded maintenance. The court ordered that S & G Sand & Gravel's equipment be sold at auction to satisfy the secured lenders, and Grunwald and Beck were each responsible for one-half of any unsatisfied claims. Beck was further ordered to pay one-half other debts totaling $24,300.00.

Beck coordinated the auction as instructed in the parties' decree of dissolution, but the 544A Loader was not listed in the notice of auction, was not physically present at the auction site, and was not sold. Corner Stone Bank subsequently repossessed the 544A Loader and Grunwald's truck. About the same time, however, Grunwald received a substantial distribution from the Mary Ann Grunwald

Trust[1] of approximately $31,000.00. Grunwald took $16,007.28 of this disbursement to buy the note back from Corner Stone Bank and thereby redeem his truck, the loader, and his good credit. Grunwald later sold the 544A Loader to his brother for $1,000.00.

After the decree of dissolution was entered, Beck did not work on a regular basis outside the home because she was the primary custodian for her children, she faced family court legal proceedings instituted by Grunwald, she was suffering through the loss of her father, and her new husband, Lonny, was working. Beck did work about ten hours a month as a bookkeeper earning approximately $22.00 per hour. Beck also attempted to open and operate a bookstore—financing the operation by mortgaging Lonny's house—but that business failed after six or seven months. Other than her bookkeeping work and her failed business, Beck testified that she was unable to find a full time job that paid a suitable income. On April 4, 2003, Lonny was terminated from his employment, and he then opened his own asphalt and concrete business. As a result of Lonny's loss of employment, Beck testified that their household income decreased. On May 22, 2003, Beck found employment making $330.00 per week working for an Arkansas attorney, but Beck was responsible for paying taxes and she did not receive any job benefits. In their Federal Income Tax Returns, Beck and Lonny reported an adjusted gross income of $60,538.00 in 1999; $37,753.00 in 2000; $27,681.00 in 2001; and $42,282.00 in 2002.

On April 9, 2002, Beck lost primary custody of her three minor children in a child custody modification decree. Because she was not working at that time, the court did not order her to pay any child support.

In Beck's January 13, 2003 bankruptcy schedules, she listed $24,000.00[2] of the amount owed to Grunwald under the decree of dissolution as unsecured, dischargeable debt. Beck also listed $18,678.26 awarded to Grunwald from the decree of dissolution,[3] and $1,534.39 owed to Grunwald from the auction of equipment in the liquidation of S & G Sand & Gravel. Of the amounts listed in Beck's bankruptcy schedules, her personal liability totals $34,373.52.[4]

---

1. Grunwald was not forthcoming with the details of the Mary Ann Grunwald Trust. Grunwald did relate that his brother and sister served as trustees. Trust disbursements were made at the discretion of the trustees, and usually occurred whenever property was sold. Grunwald testified that the trust closed two years ago, and after considerable prodding by Beck's attorney, he stated that he received approximately $50,000.00 in disbursements between the year 2000 and the closing of the trust.

2. This obligation was not $24,300.00 as indicated in the decree of dissolution because Beck paid a $300.00 advertising bill as ordered by the court.

3. This $18,678.26 debt represents Beck's liability to Grunwald on the note he bought from Corner Stone Bank. (Second Amended Complaint Objecting to Discharge of Debt ¶¶ 14–

15). The McDonald County Circuit Court had ordered the parties to sell the 544A Loader, which secured the note, at the auction of S & G Sand & Gravel to pay the parties' indebtedness to Corner Stone Bank. After redeeming the 544A Loader, Grunwald sold it to his brother for $1,000.00. In the absence of any other evidence, the Court finds that $1,000.00 represents the fair market value of the 544A Loader. Thus, the Court finds it appropriate to reduce the amount of Beck's indebtedness to Grunwald on this obligation to $17,678.26. The McDonald County Circuit Court also ordered that Beck and Grunwald were equally responsible for any outstanding debts resulting from the sale of goods at the auction. Accordingly, Beck's liability on the note purchased by Grunwald totals $8,839.13.

4. Beck still owed $24,000.00 awarded by the McDonald County Circuit Court to Grunwald

After the decree of dissolution, Grunwald did not resume his career in the horticultural industry. In fact, Grunwald did not find any employment. Alleging that he has spondylolisthesis at L5, he asserted that his lumbar back pain prevents him from working. Furthermore, since gaining primary custody of his minor children on April 9, 2002, Grunwald testified that he needed to stay home, and while he acknowledged that he was capable of working, any job would have to adapt to his children's school schedule of 7:10 a.m. to 4:10 p.m. He also testified that prior to April 9, 2002, he was unable to find a job because he was still involved with the children and he was required to attend family court proceedings. Grunwald currently receives temporary assistance, $279.00 per month, and food stamps, $452.00 per month, but he denied applying for any disability benefits. He further testified that he anticipated returning to work, and that he had contacted an employment agency to help him find suitable alternative employment. Grunwald had not filed any income tax returns since the dissolution of his marriage because he did not earn a qualifying income. Despite his lack of earned income, Grunwald testified that he is not destitute, and he resides in a three-bedroom mobile home on 5.6 acres of land, which was awarded to him in the parties' decree of dissolution.

## II. DISCUSSION

### 1. Wilful and Malicious Injury

Grunwald asserts that a portion of the debts owed to him by Beck are nondischargeable because Beck's actions in selling the equipment of S & G Sand & Gravel

at auction and in handling the proceeds from the auction were in direct violation of the decree of dissolution and damaged him by causing him to pay additional funds to Corner Stone Bank. Therefore, he contends that the debts of $18,678.26 and $1,534.39 should be determined as nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

Under 11 U.S.C. § 523(a)(6) of the Bankruptcy Code, a debt "for willful and malicious injury by the debtor to another entity" is excepted from discharge in a Chapter 7 proceeding. Section 523(a)(6)'s exemption from discharge is associated with the law of intentional torts, and conduct that is negligent or reckless— which does not rise to the level of an intentional injury—remains dischargeable. *Kawaauhau v. Geiger*, 523 U.S. 57, 60, 118 S.Ct. 974, 976, 140 L.Ed.2d 90 (1998). A willful injury requires more than an intentional act that leads to an injury; rather, the debtor must have intended the consequences of the act. *Id.* at 61–62, 118 S.Ct. 974. In the Eighth Circuit, intentional conduct occurs when an actor "knows that the consequences are certain, or substantially certain, to result from his act." *Barclays American/Business Credit., Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir.1985) (adopting the definition of "intentional" as stated in Restatement (Second) of Torts § 8A comment b (1965)). Like the interpretation of "willful," "malicious" requires the debtor's actions to be "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause financial harm." *Id.* Despite the similarities, "willful" and "malicious" are two distinct requirements that a credi-

---

under the decree of dissolution. Beck remains liable for $1,543.39 due to Grunwald from the liquidation of S & G Sand & Gravel's assets. The remaining amount Beck owes to Grunwald—$8,839.13—represents one-half

of the note Grunwald purchased from Corner Stone Bank. *See supra*, note 3. In total, Beck owes Grunwald $34,373.52 under the parties' decree of dissolution.

tor must establish by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (holding that the preponderance of the evidence standard applies to § 523 claims); *Johnson v. Miera (In re Miera),* 926 F.2d 741, 743 (8th Cir. 1991) (noting that willful and malicious are distinct elements of the § 523(a)(6) exception to discharge).

■ In this case, Beck's actions in the liquidation of S & G Sand & Gravel's assets, and the payment of secured and unsecured creditors related to her marriage to Grunwald, did not rise to the level of a willful and malicious injury as provided in 11 U.S.C. § 523(a)(6). While the Beck–Grunwald dissolution was acrimonious, Beck's treatment of Grunwald was not "willful" or targeted to cause Grunwald financial harm. Pursuant to the order of the McDonald County Circuit Court, Beck organized and prepared the equipment of S & G Sand & Gravel for auction believing that she could obtain a better price than if the items were auctioned by the sheriff on the courthouse steps. While the 544A Loader should have been at the auction site, the auctioneer did mention its existence and Beck testified that the minimum amount needed from the sale of the 544A Loader was too high to attract bidders. The truth of this statement is corroborated by the fact that Grunwald, who bought the note secured by the loader and his truck for $16,007.28, later sold the loader for $1,000.00. Also, while Beck asserted that she was in control of the auction, the evidence showed that Grunwald neither attempted to move, nor was he prevented from moving, the 544A Loader to the auction site. Grunwald simply did nothing with respect to the auction. Furthermore, the proceeds from the auction were used to pay secured creditors, with the exception of Corner Stone Bank, and pursuant to the Circuit Court's dissolution decree, Beck had previously paid their joint tax debts and unpaid business rental, totaling $5,200.00. Beck evenly split the remaining auction proceeds between herself and Grunwald. Accordingly, while Beck's actions were not flawless, they were generally in compliance with the Circuit Court's orders, and the Court finds that her conduct did not rise to the level of a willful and malicious injury within the meaning of § 523(a)(6).

### 2. Debt in the Nature of Alimony or Maintenance

In his Second Amended Complaint, Grunwald asserted that all of the debts owed to him by Beck were in the nature of alimony, maintenance, or support, and are therefore nondischargeable pursuant to 11 U.S.C. § 523(a)(5). That section provides that a debt that is designated as alimony, maintenance, or support is not dischargeable unless it is "actually in the nature of alimony, maintenance, or support..." 11 U.S.C. § 523(a)(5)(B). Grunwald did not adduce any evidence at trial to support this contention. Therefore, this ground for relief is deemed abandoned.

### 3. Debt Incurred Pursuant to a Decree of Dissolution of Marriage

■ Finally, Grunwald contends that Beck's debts to him are nondischargeable pursuant to 11 U.S.C. § 523(a)(15). Under that section of the Bankruptcy Code, certain debts incurred in connection with a divorce are nondischargeable unless the debtor can meet one of two exceptions. Specifically, the statute provides:

> [A discharge under Chapter 7 of the Bankruptcy Code does not discharge a debtor for any debt] not of a kind described in paragraph (5) [maintenance or child support] that is incurred by the

debtor in the course of a divorce ... unless—

 (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for maintenance or support of the debtor and, if the debtor is engaged in a business, for the payment of expenditures for the continuation, preservation, and operation of such business; or

 (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor;

11 U.S.C. § 523(a)(15).

 ■ Initially, the creditor bears the burden of proof that a debt falls within the parameters of § 523(a)(15)—i.e., the creditor must show that the debt was incurred in the course of a dissolution proceeding—and then the burden shifts to the debtor to establish that the debt is dischargeable because either of the conditions set forth in paragraphs (A) or (B) exists. *Fellner v. Fellner (In re Fellner)*, 256 B.R. 898, 902–03 (8th Cir. BAP 2001) (quoting *Rush v. Rush (In re Rush)*, 237 B.R. 473, 475 (8th Cir. BAP 1999)). Here, there is no dispute that Beck's debts to Grunwald arose out of the decree of dissolution issued by the McDonald County Circuit Court—which were not in the form of alimony or maintenance—and the resulting liquidation of S & G Sand & Gravel. Thus, Grunwald met his initial burden to show the debts were incurred in a dissolution proceeding. Accordingly, to be granted a discharge on

these debts, Beck must show that she either does not have the ability to pay the debts, or that the benefit to her in discharging the debts would outweigh the detrimental consequences to Grunwald.

### A. Ability of Beck to Pay

 ■ A debtor's present and future circumstances may be examined in determining disposable income for purposes of 11 U.S.C § 523(a)(15), and the court's inquiry is not limited to a mere "snapshot" of a debtor's financial strength at a single moment in time. *McGinnis v. McGinnis (In re McGinnis)*, 194 B.R. 917 (Bankr. N.D.Ala.1996). In assessing a debtor's "ability to pay," the court should apply the disposable income test rather than the undue hardship test. *McElroy v. McElroy (In re McElroy)*, 229 B.R. 478 (Bankr. M.D.Fla.1998). Because the language of 11 U.S.C. § 523(a)(15)(A) is substantially the same as 11 U.S.C. § 1325(b)(2),[5] most courts use the same disposable income test for both sections. *Moeder v. Moeder (In re Moeder)*, 220 B.R. 52, 54–55 (8th Cir. BAP 1998) (recognizing that § 523(a)(15)(A) focuses on the debtor's disposable income); *Florio v. Florio (In re Florio)*, 187 B.R. 654, 657 (Bankr.W.D.Mo. 1995) (noting that "[o]ther courts have turned to § 1325(b)(2)'s definition of disposable income as an aide (sic) in determining a debtor's ability to pay a § 523(a)(15) debt."); *Pino v. Pino (In re Pino)*, 268 B.R. 483, 496–97 (Bankr. W.D.Tex.2001) (citing cases that use a § 1325(b)(2) analysis in determining a

---

**5.** That section provides:

 "[D]isposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

 (A) for the maintenance or support of the debtor or a dependent of the debtor ... and

 (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2).

debtor's inability to pay under § 523(a)(15)(A)). Thus, after paying "reasonably necessary" personal and business expenses, the court should determine if the debtor has assets or income sufficient to pay the obligation in question by taking into consideration the debtor's entire economic circumstances. *Stuart v. Koch (In re Koch),* 109 F.3d 1285, 1289 (8th Cir. 1997).

■■■■■ In this case, Beck and Lonny filed a joint petition under 11 U.S.C. § 302. Although the filing of a joint case creates an estate under 11 U.S.C. § 541, separate estates exist for each debtor, unless or until the court orders substantive consolidation.[6] *Reider v. FDIC (In re Reider),* 31 F.3d 1102, 1105 (11th Cir.1994). Accordingly, a joint petition simply results in two different debtors' bankruptcy cases being commenced by a single petition, and treated as a single case for administrative purposes. Nevertheless, the estate of the spouse in a joint petition is relevant in determining a spouse's ability to pay under § 523(a)(15)(A), and in weighing the benefits and detriments of a discharge under § 523(a)(15)(B). *Crawford v. Osborne (In re Osborne),* 262 B.R. 435, 444 (Bankr. E.D.Tenn.2001) (stating that if a debtor spouse has remarried, the new spouse's income should be considered in calculating disposable income). *See also Shea v. Shea (In re Shea),* 221 B.R. 491, 499–500 (Bankr.D.Minn.1998); *Cleveland v. Cleveland (In re Cleveland),* 198 B.R. 394, 398–99 (Bankr.N.D.Ga.1996); *In re Smither,* 194 B.R. 102, 108 (Bankr.W.D.Ky.1996); *Comisky v. Comisky (In re Comisky),* 183 B.R. 883, 883–84 (Bankr.N.D.Cal.1995). *Cf. Burgess v. Henrie (In re Henrie)* 235 B.R. 113 (Bankr.M.D.Fla.1999) (stating that the plain language of § 523(a)(15)(A) restricts a determination of ability to pay solely to the income of a debtor, and the income of a new spouse is not to be considered).

■■■■ Beck testified that she earns approximately $220.00 by working as a bookkeeper for just ten hours a month. Also, Beck obtained a job in May 2003 earning $330.00 per week before subtracting any payroll taxes, for which she is responsible. Thus, before to subtracting her payroll taxes, Beck makes approximately $1,639.00 per month ((4.3 × $330.00) + $220.00). Because Beck shares a home with Lonny, she is not solely responsible for payment of the mortgage, utilities, food, and other costs, which are calculated at $3,105.00 per month on the Debtors' schedules. Specifically, Beck and Lonny claimed the following expenses: mortgage—$698.00; electricity and heating fuel—$240.00; water—$15.00; telephone—$210.00; home maintenance—$100.00; food—$400.00; clothing—$50.00; laundry and dry cleaning—$50.00; medical and dental—$50.00; transportation—$160.00; auto insurance—$130.00; auto installment payments—$393.00; computer installment payments—$121.00; and business expenses in the amount of $488.00. Regarding the business expenses, Beck estimated that her future bookkeeping business expenses were only $23.00 per month while Lonny's business expenses totaled $465.00 per month. Attributing one-half of all the combined liv-

6. Because Beck's debts to Grunwald are her separate obligations arising out of her former marriage, the Court will not order substantive consolidation of Beck and Lonny's estates in this matter. *See Reider v. Federal Deposit Insurance Corp. (In re Reider),* 31 F.3d 1102, 1108–09 (11th Cir.1994) (stating that joint administration does not create substantive rights and "[i]n assessing the propriety of substantive consolidation [between spouses], a court must determine: (1) whether there is a substantial identity between the assets, liabilities, and handling of financial affairs between the debtor spouses; and (2) whether harm will result from permitting or denying consolidation.").

ing expenses to Beck, plus her $23.00 per month in business expenses, results in monthly liabilities of $1,331.50 (($2617.00 ÷ 2) + $23.00). Accordingly, before deducting payroll taxes, Beck has approximately $307.50 per month in disposable income that is not committed to a reasonably necessary maintenance or support expense for herself or for her business, and thus, could be paid to Grunwald. Therefore, since Beck has the ability to pay the debts owed to Grunwald without depriving herself and her dependents of the necessities of support, the Court finds that Beck is not entitled to a discharge under § 523(a)(15)(A).

## B. Relative Benefits and Detriments

▮ Because Beck's debt to Grunwald is excepted from discharge under 11 U.S.C. § 523(a)(15)(A), the Court must next weigh the relative benefits and detriments that would result from the discharge of the debt under § 523(a)(15)(B). An assessment of the benefits and detriments under § 523(a)(15)(B) requires an analysis of the totality of circumstances, not just a comparison of the parties' net worth. *Gamble v. Gamble (In re Gamble)*, 143 F.3d 223, 226 (5th Cir.1998); *In re Florio*, 187 B.R. at 658. The totality of the circumstances test also includes income contributed to a debtor from a spouse. *In re Crosswhite*, 148 F.3d 879, 889 (7th Cir.1998). The test necessitates comparing the lifestyles of both parties and making a determination, pursuant to the court's inherent equitable power, to measure the benefit of a discharge against the degree of harm. *Schaefer v. Deppe (In re Deppe)*, 217 B.R. 253, 261 (Bankr. D.Minn.1998).

▮ After the Grunwald–Beck union dissipated, Beck moved in with Lonny, who owned a standard ranch-style home with a hot tub and an above-ground swimming pool. Occasionally, Beck hired a housekeeper whom she paid $45.00 a visit. After losing primary custody of her three children on April 9, 2002, Beck was not ordered to pay child support, and she was not required to pay Grunwald any maintenance. While Beck's current income is approximately $1,639.00 per month, Lonny lost his job on April 4, 2003, and he began self-employment. Lonny's former job accounted for $1,883.38 of his $2,618.38 in total monthly income. The amount Lonny currently earns in self-employment was not fully disclosed by Beck, but she testified that it is less than what Lonny made as an employee, and the loss of his job was a motivating factor in her obtaining work outside the home.

By contrast, Grunwald testified that he has no monthly income, he is on public assistance, and because he is the children's primary care-giver, he is having a difficult time finding employment. Grunwald insists that any job must be flexible enough to adapt to his children's school schedule, and must be a light duty position to accommodate his spondylolisthesis. Grunwald testified that he had a Master's Degree in Food Technology, but he was unable to articulate the availability of jobs within his local community. While Grunwald had previously enjoyed substantial benefits from the Mary Ann Grunwald Trust, that source of income is no longer available to him because the trust had closed by the time of the trial. Grunwald lives in a three-bedroom mobile home situated on 5.6 acres of land, which was awarded to him in the parties' decree of dissolution.

In weighing the relative benefits and burdens, Beck failed to establish entitlement to a discharge under § 523(a)(15)(B). The Court finds that the detriment to a potentially disabled, out-of-work, single father, in charge of three children, who is on food stamps and public assistance, weighs

more heavily in favor of excepting Beck's debt from discharge than the benefits to a working, non-custodial mother, who is paying no child support, who enjoys a higher standard of living, and who has some disposable income to pay the debt to her former spouse arising out of their decree of dissolution. Thus, under the provisions of § 523(a)(15)(B), Beck is not entitled to a discharge of the debts owed to Grunwald.

### III. ORDER

Therefore, it is

**ORDERED** that the actions undertaken by Gina Michelle Beck after the entry of a decree of dissolution by the McDonald County Circuit Court did not constitute intentional and willful conduct within the meaning of 11 U.S.C. § 523(a)(6) of the Bankruptcy Code.[7] Therefore, Beck's debt to Ronald M. Grunwald is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). It is

**FURTHER ORDERED** that Ronald M. Grunwald failed to adduce any evidence that Gina Michelle Beck's debts were in the nature of alimony, maintenance, or support, and therefore Beck's debt to Ronald M. Grunwald is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(5). It is

**FURTHER ORDERED** that Gina Michelle Beck's debt to her former spouse, Ronald M. Grunwald, totaling $34,373.52, is excepted from discharge under 11 U.S.C. § 523(a)(15) because the debt was incurred in a decree of dissolution of marriage, Beck has the ability to pay the debt from her disposable income under § 523(a)(15)(A), and the relative detriments to Grunwald in allowing Beck to

discharge the debt outweigh the benefits to Beck under § 523(a)(15)(B).

---

7. This Order in no way makes any determination of the pending State court contempt action brought by Grunwald against Beck for allegedly violating the terms of the decree of

dissolution. The Court only finds that Beck's conduct was not willful or malicious as defined by 11 U.S.C. § 523(a)(6).