**In re Mark Lewis BEGGS.**

**Mark Lewis Beggs, Plaintiff,**

v.

**Diane Niewdach, Defendant.**

**and**

**Mark Lewis Beggs, Plaintiff,**

v.

**Tripcony Law Firm, P.A., Defendant.**

**Bankruptcy No. 4:03–BK–19461E.**

**Adversary Nos. 4:03–AP–1326, 4:04–AP–1012.**

United States Bankruptcy Court, E.D. Arkansas, Little Rock Division.

Sept. 15, 2004.

404

Larry Hartsfield, Little Rock, AR, for Plaintiff/Debtor.

David Jacobs, Little Rock, AR, for Defendant Diane Niewdach.

Jim Tripcony, Little Rock, AR, for Defendant Tripcony Law Firm.

Richard Ramsay, Little Rock, AR, Trustee.

## MEMORANDUM OPINION

AUDREY R. EVANS, Bankruptcy Judge.

Now before the Court are the Complaints to Determine Dischargeability filed by the Debtor–Plaintiff Marck[1] Lewis Beggs ("**Debtor**") against Defendants Diane Niewdach ("**Niewdach**") and Tripcony Law Firm, P.A., respectively. The above-captioned adversary proceedings were consolidated only for trial purposes in an Order entered on February 14, 2004, and trial was held on these Complaints on June 4, 2004 (the "**Trial**"). On June 28, 2004, Niewdach filed a Motion for Leave to Reopen Record to proffer new evidence regarding potentially false and/or misleading testimony by the Debtor regarding his income. The Court granted that motion by Order dated July 1, 2004, and the record was reopened for that purpose on July 19, 2004 (the "**Evidentiary Hearing**"). At the Evidentiary Hearing, evidence was proffered regarding the Debtor's income, and regarding his prior testimony regarding

his income. The Debtor objected to introduction of evidence regarding his income after the Trial date, and the Court took this objection under advisement. Appearing at both the Trial and Evidentiary Hearing were: Larry Hartsfield on behalf of the Debtor; the Debtor; David Jacobs on behalf of Niewdach; Niewdach; and Jim Tripcony on behalf of himself and the Tripcony Law Firm.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This Order shall constitute findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

Niewdach and the Debtor were married on April 13, 1996. They had no children together, but Niewdach had one child, Nicole Niewdach, from a previous marriage. Nicole Niewdach is now in college. Niewdach filed a complaint for divorce in April 2003. Debtor did not contest the divorce. A Property Settlement Agreement was signed by the parties on April 21, 2003, and filed in Pulaski County Circuit Court ("**State Court**") on April 22, 2003. The Property Settlement Agreement provides that its terms are incorporated into, but not merged with, the Divorce Decree which was entered in State Court on June 23, 2003. Neither party has since remarried. Debtor attempted to have the Property Settlement Agreement set aside in State Court, but failed. Debtor filed a petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code on August 8, 2003. Debtor filed a Complaint against Diane Niewdach, his former spouse, on October 21, 2003, in which he seeks to discharge certain prepetition obli-

---

1. The Debtor's name was sometimes spelled "Mark" and other times "Marck" in these pleadings; although these cases were styled in the name of "Mark Lewis Beggs," it ap- pears that the correct spelling of Debtor's first name is "Marck" based on documents received into evidence in this case.

gations owed to Niewdach pursuant to the Property Settlement Agreement. Those obligations which Debtor seeks to discharge (the **"Obligations"**) include:

1) the purchase of an automobile [2] to be chosen by Niewdach;

2) maintaining and paying all premiums or other fees on a life insurance policy issued by American Express;

3) payment of a second mortgage on the former residence of the parties; and

4) payment of Niewdach's attorney's fees and costs incurred in the prosecution of the divorce action between the parties.

Debtor also filed a complaint against the Tripcony Law Firm on January 13, 2004, seeking to discharge his obligation to Niewdach to pay for her attorney's fees and costs.[3]

### The Property Settlement Agreement

The obligations listed above arise from the following provisions in the Property Settlement Agreement:

Paragraph 3(f), under the heading **"PERSONAL PROPERTY"**:

> Within 15 days of the entry of a Decree of Divorce in this cause, Husband shall purchase a new computer and automobile of wife's choosing, not to exceed a combined sales price of $25,000.00 for the computer and automobile, for Wife and Wife shall have sole ownership and possession of said vehicle and computer. The funds used to purchase said vehicle and computer shall constitute property settlement and shall not be considered alimony or support to Wife, and therefore, shall not be includable in the in-

come of the Wife; nor shall said amount be deductible by Husband for tax purposes.

Paragraph 4(d), under the heading **"BANK ACCOUNTS, SECURITIES ACCOUNTS, RETIREMENT ACCOUNTS, FUNDS and BENEFICIARY DESIGNATIONS"**:

> Husband shall maintain and pay all premiums or other fees [sic] the American Express life insurance policy and shall keep Nicole Niewdach named as a sole beneficiary of said policy. Further the parties agree that a copy of this Agreement may be provided to American Express with instructions to notify Wife, in writing, before any changes in beneficiary or cancellation may be effective.

Paragraph 5(e), under the heading **"DEBTS"**:

> Husband shall be responsible for and indemnify and hold Wife harmless for the home equity loan which was taken out for the purpose of consolidating the parties' debt, including Husband's car note.

Paragraph 20, **"ATTORNEY'S FEES AND COSTS"**:

> Within 30 days of presentation of a statement of account, Husband shall pay the attorney's fees and costs incurred by Wife in this action.

Another provision in the Property Settlement Agreement pertinent to this decision is Paragraph 6, **"ALIMONY"**:

> Husband shall pay to wife $700.00 per month as a reasonable sum of permanent alimony for a period of 15 years

---

**2.** In his Complaint, Debtor also sought to discharge an obligation to purchase a computer for Niewdach; it was conceded at Trial that the computer has been purchased and is no longer an obligation at issue in this case.

**3.** The Debtor also filed an Objection to Proof of Claim in which Debtor objects to a priority claim filed by the Tripcony Law Firm in the amount of $7,168.28 for these attorney fees and costs. The Objection to Proof of Claim is currently set for hearing on October 25, 2004.

following the date of the entry of a Decree of Divorce in this action. Upon the entry of a Decree of Divorce, each party shall be responsible for their own health and dental insurance and for any medical or dental costs not covered by such insurance.

Under the Property Settlement Agreement, Niewdach was awarded possession of, and title to, a residence at 8010 Sparks Road in Little Rock, Arkansas, which sits on 10 acres, and Niewdach was to be responsible for the first mortgage on this property. Debtor was awarded sole possession and ownership of a 1999 Daewoo and was to be responsible for any indebtedness on that vehicle. The Property Settlement Agreement also provides that Niewdach and Debtor are to retain their respective current shares in the Beggs Family Partnership and the Beggs Family Plantation, and that should either or both entities be dissolved or reorganized, Debtor is to pay to Niewdach 50% of his interests in the business(es).

Debtor testified that he signed the Property Settlement Agreement at a store but was unaware that the document he signed was a Property Settlement Agreement at that time. He said he only saw three or four pages of it and never read it. He had no lawyer at that time. He testified that a month or two later, he realized he was divorced, read the Property Settlement Agreement and hired counsel, Larry Hartsfield. Debtor testified that he thought he was signing an agreement regarding the division of household furniture, and had never discussed with Niewdach about two-thirds of what was in the agreement. He also testified that he was never given a copy of the agreement and only saw it after hiring Hartsfield. Hartsfield assisted him in trying to set aside the Property Settlement Agreement in State Court, but his petition to set aside was denied. He then filed bankruptcy.

### The Car Obligation

Debtor testified that although the Property Settlement Agreement states that he is obligated to purchase a new car for his ex-wife, her new car, a Hyundai Santa Fe, was purchased before the divorce. Debtor testified that his ex-wife needed the car and it was not a financial burden at that time. Likewise, Niewdach testified that about a month after obtaining the second mortgage, she got a new car because her car was a 1995 model with 200,000 miles. Debtor introduced a copy of the contract of sale dated April 19, 2003, indicating that Debtor, Niewdach, and Nicole Niewdach were the buyers of a 2003 Hyundai Santa Fe for a purchase price of $18,995, to be financed by Southland Hyundai at 5.75% interest, or monthly payments of $365.89 for 60 months.

### The Life Insurance Obligation

Debtor testified that he is obligated to pay the life insurance premiums on the policy on his life, the beneficiary of which is Nicole, and that he continues to pay these premiums.

### The Second Mortgage Obligation

Niewdach testified that she and Debtor borrowed funds from Superior Federal Bank secured by a second mortgage on their home to consolidate debts and better handle their finances in March 2003. Niewdach introduced a copy of Superior Federal's proof of claim filed in the Debtor's bankruptcy case along with copies of the promissory note, mortgage, and security agreement evidencing the loan. According to these documents, the initial loan was for $43,098.39 at 6.004% interest with monthly payments due of $832.12. Debtor agreed that this was a debt consolidation loan but testified that he did not know much about it because his ex-wife arranged the loan and handled all legal and financial matters for them while they

were married. He believes the loan was about $43,000 and that it was used to pay off his Daewoo (on which he owed $8,000), pay for renovations to their bedroom and bathroom, and pay off credit card debts. However, Debtor testified that he does not really know what debts were paid off with the second mortgage funds. Niewdach testified that as of March 2003, just about all of their debts were paid off with the loan proceeds. Niewdach introduced copies of letters and checks to various creditors paying off the following accounts (account numbers have been redacted for privacy purposes) in the following amounts:

| Account | Amount |
|---|---|
| Visa # xxxx–xxxx–xxxx–4696 | $ 3,073.00 |
| MBNA # xxxx–xxxx–xxxx–0287 | $ 9,011.00 |
| Discover # xxxx–xxxx–xxxx–5303 | $10,370.00 |
| JC Penney # xxx–xxx–xxx–0 | $ 602.00 |
| Exxon # xxx–xxx–0597 | $ 1,784.00 |
| Sam's Club # xx–xxxx–0346716 | $ 888.42 |
| Truservice # xxxx–81 | $ 5,831.03 |
| Total | $31,559.45 |

Together with the payoff of Debtor's Daewoo (which Debtor testified was $8,000), this accounts for the bulk of the loan proceeds.

### The Attorney's Fees Obligation

The last paragraph of the Property Settlement Agreement provides that Debtor is to pay for the attorney fees and costs incurred by his ex-wife in the divorce proceeding. Niewdach testified that she retained Mr. Scholl, of the Tripcony Law Firm, in mid-April 2003 and the complaint for divorce was filed soon thereafter. She testified that once she agreed to divorce Debtor, he was very nice and agreeable to the property settlement. She said that because he wanted the divorce, she wanted him to pay for it; she asked him to, and he agreed to pay for her lawyer. She testified that she needed him to pay for the divorce as part of her support and maintenance. Debtor testified that he was surprised that he was obligated to pay her

attorney fees, as he had not previously discussed this obligation with Niewdach. He said he thought their plan was to work something out and then go see a lawyer. He also testified that he did not recall the provision regarding attorney fees being in the Property Settlement Agreement at all, but admitted that he had raised that issue in State Court when trying to set aside the Property Settlement Agreement, and lost.

Jim Tripcony elicited testimony from Keily Meinex, a legal secretary and billing clerk at the Tripcony Law Firm, regarding the firm's procedure for entering an attorney's time and sending bills to clients. An engagement letter between Niewdach and the firm was introduced showing that she was represented by Mr. Scott Scholl who is no longer with the Tripcony Law Firm, and that she agreed to pay a $900 retainer and Mr. Scholl's hourly rate of $160. Ms. Meinex testified that as of June 23, 2003, the date the divorce decree was entered, Niewdach owed $4,254.58 in attorney's fees and costs, and that an additional $2,913.70 was incurred after the date the divorce decree was entered. Ms. Meinex testified that these charges were incurred due to subsequent proceedings in the divorce case including another court appearance. Niewdach explained that the case blew up after they had executed the Property Settlement Agreement. She testified that all contacts with Mr. Scholl were with respect to her representation in the divorce. She explained that because Debtor tried to set aside the Property Settlement Agreement, a lot of time spent was spent on that, resulting in more fees. She also testified that at one point, Debtor tried to adopt her daughter, and some of the fees were incurred in connection with that. Additionally, Niewdach testified that just before the divorce, she agreed to seek counseling, but after going to counseling, she caught him with the person he was supposed to

have stopped seeing and he became violent towards her so she obtained an order of protection against Debtor as part of the divorce proceedings.

### Debtor's Financial Circumstances

Debtor has a Ph.D. in English and is employed by Henderson State University ("HSU") in Arkadelphia, Arkansas where he serves as the Dean of Graduate Studies. His duties include overseeing all graduate programs, teaching half-time and auditing student files. He testified that he works from 8:00 a.m. to 5:00 p.m., and cannot work on weekends because he occasionally has to attend conferences. According to his Schedule I introduced in evidence, his current monthly income is $3,291.38 after taxes and other deductions, including $24.16 for insurance and $273.43 for "TIAA/CREF".[4] He testified that his salary at HSU is currently $55,000 approximately, and that he made approximately $5,000 teaching freelance online writing courses the year before. He testified that his freelance work is irregular and sporadic. Debtor has published a book of poetry but has received no royalties on it. He also testified that he is currently writing a book but expects to receive no money from that either. With respect to the Beggs Family Partnership and Beggs Family Plantation, in which he owns interests, Debtor testified that he received $1,200–$1,800 a few years ago when some timber was cut but has received no money since then. Accordingly, the Debtor's only sources of income are his salary and freelance earnings.

At Trial, Debtor testified that he does not expect an annual raise from HSU because the state universities are in "big trouble," and he received no raise the year before, and only received a 1–2% raise in prior years. Specifically, the testimony at Trial was as follows:

Jacobs: Now would you say that there is a disparity in your incomes?

Beggs: The last I recall she earned almost 40,000 and I make about 55,000. If you subtract the alimony that she's getting I think we're pretty close.

Jacobs: Now do you get annual raises?

Beggs: No.

Jacobs: You've never gotten a raise?

Beggs: I've Gotten A Raise Before. I Haven't Gotten An Annual Raise. I Don't Know If You've Been Reading The Papers, But The Universities Are In Big Trouble Right Now; We're Not Getting The Money So We Did Not Get Raises Last Year, And The Raises We've Gotten Previously Have Been About One Or Two Percent.

At the Evidentiary Hearing, a letter from the President of HSU informing Debtor that he would receive a salary increase was introduced into evidence.[5] That letter reads, in part:

I am pleased to inform you that the Board of Trustees at its regular meeting on April 29, 2004, approved the recommendation of a salary increase for you. This is in recognition of your position as Graduate Dean at Henderson State University. I want to add my congratulations to you for this and my personal thanks for your work at Henderson. Your new salary of $64,831 represents an increase of 16.3%. A $9,085 adjust-

---

4. The Property Settlement Agreement indicates that TIAA–CREF is a retirement account of the Debtor's which is to be equally divided between the Debtor and Niewdach as of the date of the divorce decree.

5. Although Debtor generally objected to the Court's consideration of evidence regarding the Debtor's future earnings, he did not object to the entry of these exhibits.

ment is planned for FY06 and FY07, provided funds are available.

Niewdach also introduced a salary contract indicating a salary of $64,831 for the 2004–5 fiscal year, which reads in part:

> This is to notify you that the Board of Trustees as its meeting held on April 29, 2004, approved your appointment for 2004–05 at the salary listed above. The breakdown of the above salary is explained in the attached letter and said letter is expressly incorporated herein as part of this salary contract as well as the provisions of the attached statement entitled 'Personnel Policies—Faculty and Administration, Henderson State University'.

The Debtor admitted that he received the salary contract and letter prior to the June 4, 2004 Trial. With respect to his prior testimony and the letter described above, Debtor testified, in part:

> Jacobs: Dr. Beggs, do you remember having a hearing in this case on June the 4th, 2004?
>
> Beggs: Yes.
>
> Jacobs: Do you remember me asking if you got annual raises?
>
> Beggs: You asked me if now I get annual raises, yes.
>
> Jacobs: In fact, the question was, "Now do you get annual raises?"
>
> Beggs: Yes.
>
> Jacobs: And what was your answer?
>
> Beggs: My answer was no. My answer probably should have been usually no. I haven't got an annual raise in about three of four years.
>
> Jacobs: I'm going to show you a document—
>
> Beggs: Uh-huh.
>
> Jacobs: Do you recognize that document?

> Beggs: Yes, that's my adjustment which is different from an annual raise at my university.
>
> Jacobs: How much of an adjustment did you get this year?
>
> Beggs: This year I'm getting an adjustment for $9,000. That's not what you asked.
>
> Jacobs: You went up to $64,831, an increase of 16.3 percent of your—
>
> Beggs: Correct.
>
> Jacobs: salary?
>
> Beggs: Yes.

With respect to the salary contract described above, the Debtor testified, in part:

> Jacobs: Now [the salary contract] specifically refers to the other letter and indicates it's salary. Is that correct?
>
> Beggs: Yes.
>
> Jacobs: It doesn't say some kind of what did you call it?
>
> Beggs: Adjustment.
>
> Jacobs: It calls it salary.
>
> Beggs: The other letter calls it an adjustment.
>
> Jacobs: But this one has your signature.
>
> Beggs: Yes, it is salary, yes, it's a raise.

Debtor attempted to explain his failure to disclose the salary increase on cross-examination by his attorney:

> Hartsfield: And at Henderson State University, are there various types of salary increases?
>
> Beggs: Yes, there are at least three.
>
> Hartsfield: Would you explain to the Court what those three types of salary increases are?
>
> Beggs: There are annual raises which are the small across-the-board raises that everybody gets. There are adjustments and there are promotions. I have primarily received adjustments and promotions. When you receive that you're told you're not getting an

annual raise. In other words, if I get a promotion when I became dean, I got a promotion. I'm getting an adjustment now because the president has determined that my salary is below what it should be for my position. It's an adjustment; and I was also informed that as a result I will not be getting the across-the-board annual raise, if that's given.

Through further cross-examination, the Debtor went on to explain that he was not asked at Trial what his salary would be for the upcoming year, but that had he been asked that question, he would have revealed the salary contract at issue because it was a matter of public record anyway.

When questioned by Mr. Tripcony, the Debtor testified:

Tripcony: Dr. Beggs, when Mr. Jacobs asked you at the last hearing about raises, was it your impression that he was trying to find out for the Court's benefit if you were going to make any more money in the next year or so?

Beggs: No, I thought if he wanted to know what I was going to make next year, he would have asked me. It didn't cross my mind.

Tripcony: Didn't—didn't cross your mind that Mr. Jacobs wanted the Court to know whether you were going to be making more money next year than this year?

Beggs: No, he asked a rhetorical question. I thought he would have said, "Are you going to make more money next year?" if he wanted to know that. He didn't ask that. So it didn't occur to me. He asked about raises in general.

Tripcony: And so it's still your testimony that you're not going to get a raise next year, correct?

Beggs: I didn't testify to it before. My testimony if you're asking me is, yes, I'm getting a raise next year.

Tripcony: All right. I thought you were going to get a salary adjustment?

Beggs: It's a raise. It's a type of—

Tripcony: It's still the same thing, are they not?

Beggs: No, it's a type of raise, no. There are specific differences at my place of employment.

Mr. John Choate, general counsel to HSU, testified that the letter and salary contract were mailed out on April 29, 2004, prior to the June 4 Trial. On cross-examination, Mr. Choate described the different types of pay increases employees at HSU may receive. His testimony, in part, was as follows:

Hartsfield: Let's explore the term of art "annual raise." Does the Arkansas legislature approve annual raises for employees of state universities annually? I mean, every year?

Choate: No. It's a budget matter.

Hartsfield: In the last six years have employees of state—of Henderson State University gone without annual raises?

Choate: Yes.

Hartsfield: Even if we ignore the intra-university or intra-educational system term of art "annual raise," and take the commonly-held definition of that term, meaning a raise every year—

Choate: Right.

Hartsfield: —when Dr. Beggs answered the question, "Do you get annual raises?" in the negative, was that a correct answer to that question? He was asked the question, "Now do you get annual raises?" His answer was "No." Outside the university, just everyday common street definition of

"annual raises," was that a correct answer to that question?

Choate: It's—I'm having a real hard time answering that. And the reason being if you turn that within the university system, if you said "an annual raise," then I would say it's correct because there was not the across-the-board annual raise. To a man on the street, probably it would have been. I mean, it was an increase in salary. It would have been a raise, but the term of art, you know, would only apply to people within higher education who would understand "annual raise" to mean the across-the-board raise for all employees.

In sum, despite Debtor's testimony that he would not receive a raise this year, Debtor will in fact receive a salary increase of $9,085 this fiscal year, and a $9,085 increase is planned for fiscal years 2006 and 2007, provided funds are available.

Debtor submitted the following items as his monthly expenses:

| Expense | Amount |
| --- | --- |
| Rent | $ 500.00 |
| Electricity | $ 100.00 |
| Telephone | $ 105.00 |
| Food | $ 300.00 |
| Clothing | $ 85.00 |
| Laundry/Dry Cleaning | $ 20.00 |
| Medical/Dental Expenses | $ 50.00 |
| Transportation (not including car payments) | $ 300.00 |
| Recreation/Entertainment | $ 40.00 |
| Life Insurance | $ 95.00 |
| Auto Insurance | $ 95.00 |
| Car Payment | $ 337.00 |
| Personal Property Taxes/Car Tags | $ 11.00[6] |
| Student Loans | $ 235.00 |
| Alimony | $ 700.00 |
| Misc. Expenses | $ 153.00 |
| Total | $3,126.00 |

According to the Debtor's testimony, the $153 miscellaneous monthly expenses in-

clude haircuts, expenses incurred to take care of his pets, and clothes. When questioned about the debts listed on his bankruptcy schedules, he testified that he thought Niewdach incurred some of the debts owed on his credit cards (approximately $5,000 or $6,000 out of approximately $28,000), and that he had to live off his credit cards because she was getting his paychecks for a few months after their divorce.

At the time of Debtor's divorce, his vehicle, the 1999 Daewoo, had been paid off. He testified that it subsequently threw a timing belt, and he was advised to purchase a new car. In September or October of 2003, he purchased a new Volkswagen Beetle for $20,000. Debtor's parents helped him obtain financing to buy the Beetle, and his car payments on the Beetle are $337 per month. He testified that the Daewoo is in the junkyard.

Debtor testified that he incurs transportation costs of at least $300 per month because he lives in Little Rock and commutes to work in Arkadelphia. He testified that if he lived in Arkadelphia, he would have to pay more rent. He estimated that a one bedroom apartment in Arkadelphia would cost about $500 per month plus utilities. He also claimed that he needed to live in Little Rock on his family's property so that he could take care of his 75–year–old parents. He testified that his father is in poor health, and the Debtor does lots of manual labor on their property, such as "trimming." His only sister lives in Atlanta, Georgia, and his only brother lives on the family property but does not communicate with his parents. Debtor testified that he lives in a one-room cabin owned by his sister and pays her $500 per month in rent. The cabin is

---

**6.** Although Debtor listed $130 as his monthly expense for personal property taxes and car tags, he testified that this was in fact $130 per year; accordingly, this amount should be $11 per month.

directly across the road from the residence where he formally resided with Niewdach on 300 acres of family property.

Regarding the student loan payments of $235 per month, Debtor testified that he pays one for himself and one for his former step-daughter, Nicole, which he is legally obligated to pay. Debtor testified that he cannot make the required payments on his ex-wife's car now that he has to make payments on his own car. He testified that he made payments on her car until he obtained the Beetle. Debtor also testified that he could not pay the second mortgage on Niewdach's home which he is obligated to pay under the Property Settlement Agreement.

### Niewdach's Financial Circumstances

Niewdach is employed by the postal service and makes approximately $43,000 per year, taking home $1,897 per month. Including her $700 per month alimony payments (totaling $8,400 per year), her total monthly income is $2,597. She has been at the maximum level for her position since 1997 and has been unable to work overtime due to her health. She has tried to find higher paying jobs but cannot. She is in very poor health; she has cervical cancer, a degenerative disc, and suffers from depression. At the time of her divorce, she had unexplained bleeding, underwent a breast biopsy, had a blood clot, and the disc problem in her back. The cervical cancer was not diagnosed at the time of her divorce. She is receiving treatment for her cancer but has not been notified that it is in remission. She owes about $12,000 on her medical bills and is barely making the minimum payments on those. She testified that she has been using credit cards to pay for many of her prescriptions.

According to the documentation she filed with the Bankruptcy Court, Niewdach's expenses are $3,697.10 per month, not including the car payment and second mortgage payment. This is more than $1,000 in excess of her monthly income. With the car payment and second mortgage payments, she is more than $2,300 short. Niewdach testified that she cannot afford to pay her attorney's fees for the divorce, can barely make the minimum payment due on her medical bills, cannot make her car payment at all (her sister is currently making the car payments), and borrows money from friends and/or relatives to make the payments on the second mortgage. The bank has threatened to foreclose on her home, and she cannot continue to live there unless Debtor begins making payments on the second mortgage. She testified that she cut her expenses back by eliminating certain monthly expenses such as Direct TV ($38), and dining out and entertainment ($156). She also testified that although she paid off the bulk of her credit card debt with the second mortgage proceeds in March 2003, she has since incurred additional credit card debt in order to pay for her prescriptions and other expenses, and she pays approximately $285 per month on those credit cards.

Niewdach testified that she is trying to sell her home and five acres on which it sits. She plans to keep the remaining five acres for herself. She said she owes $130,000 on her first mortgage, $36,000 remains on the second mortgage, and she is asking $189,000 for the house. She expects to net approximately $5,000 from the sale after closing costs, but the house had been on the market for nine months at the time of Trial, and she had received no offers. Upon sale of the home, the Debtor will be relieved of the second mortgage obligation provided there is no deficiency.

## DISCUSSION

Before the Court is an adversary proceeding filed pursuant to §§ 523(a)(5) and

523(a)(15) of the Bankruptcy Code. A discussion of those code sections and an analysis of how they apply to this case follows.

## A. Support Debts—§ 523(a)(5).

Section 523(a)(5) provides that a debt owed to a spouse, former spouse, or child for alimony, maintenance, or support (a "support obligation") is nondischargeable unless such debt is either assigned to another entity or, although designated as alimony, support, or maintenance, is not actually in the nature of alimony, support, or maintenance. *See generally Draper v. Draper*, 790 F.2d 52 (8th Cir.1986); *Mencer v. Mencer (In re Mencer)*, 50 B.R. 80 (Bankr.E.D.Ark.1985). "Exceptions from discharge for spousal and child support deserve a liberal construction, and the policy underlying § 523 favors the enforcement of familial obligations over a fresh start for the debtor, even if the support obligation is owed directly to a third party." *In re Woods*, 309 B.R. 22, 27–28 (Bankr.W.D.Mo.2004) (*citing Holliday v. Kline (In re Kline)*, 65 F.3d 749 (8th Cir. 1995); *Williams v. Kemp (In re Kemp)*, 242 B.R. 178, 181 (8th Cir. BAP 1999), *aff'd* 232 F.3d 652 (8th Cir.2000)).

In an adversary proceeding filed pursuant to § 523(a)(5) of the Bankruptcy Code, the nondebtor former spouse must first demonstrate that the debts were in the nature of a support obligation. *See Sturdivant v. Sturdivant (In re Sturdivant)*, 289 B.R. 392 (Bankr.W.D.Ark.2003). Once the nondebtor spouse has shown that the obligation is for support, the burden of going forward and proving the obligation is not in fact a support obligation shifts to the debtor spouse. *In re Portwood*, 308 B.R. 351, 354–355 (8th Cir. BAP 2004).

The critical issue in determining whether a debt is a support obligation in a dissolution decree or separation agreement entered into by agreement of the parties is what the intent of the parties was when they made the agreement. *See Jarrett v. Wright (In re Jarrett)*, 181 B.R. 935 (Bankr.E.D.Ark.1995). However in the contested divorce scenario or circumstance, the focus is necessarily on the state court's intent rather than the parties'. *See In re Morel*, 983 F.2d 104, 105 n. 3 (8th Cir.1992); *Portwood*, 308 B.R. at 356. The intent of the parties, or the state court, as the case may be, is determined by the totality of circumstances; however, the Court may consider a number of factors, including: (1) whether the obligation terminates on death or remarriage; (2) the characterization of the payment in the decree and the context in which the provision appears; (3) whether the payments are to balance disparity in income; (4) whether the payments are to be made directly to the spouse or to a third party; (5) whether the obligation is payable in a lump sum or in installments; (6) whether the parties intended to create obligation of support; (7) whether assumption of the debt has the effect of providing the support necessary to insure the daily needs of the former spouse; and (8) whether assumption of the debt has the effect of providing support necessary to insure a home for the spouse and minor children. *Sturdivant*, 289 B.R. at 397–398. *See also Moeder v. Moeder (In re Moeder)*, 220 B.R. 52 (8th Cir. BAP 1998); *Johnson v. Hamblen (In re Hamblen)*, 233 B.R. 430 (Bankr.W.D.Mo.1999). With regard to these elements, the Court views the circumstances *as of the time of the agreement;* the current needs of the parties are not relevant to the determination. *See In re Draper*, 790 F.2d at 54 & n. 3.

Of the debts that Debtor seeks to discharge, only one was contended to be in the nature of support—the obligation to pay Niewdach's attorney's fees. No argument was made that the car, second mort-

gage, and life insurance obligations constituted support obligations. Additionally, the Property Settlement Agreement specifically states that the car obligation is not in the nature of support or alimony. Accordingly, the Court will determine only whether the attorney's fees obligation constitutes a support obligation.

The Court examines the evidence presented in light of the noninclusive factors listed above and set forth in *Sturdivant.* Some of those factors are not particularly relevant to this type of obligation, and accordingly, receive little weight. For example, because the attorney fees obligation is to pay a debt to a third party, and not simply an obligation to provide a former spouse with cash or other property, it does not terminate on Niewdach's death, and is presumably to be paid in a lump sum. Courts have found an obligation to pay a debt to a third party, and more particularly, the obligation to pay a spouse's attorney's fees to be in the nature of a support obligation. *In re Woods,* 309 B.R. 22, 27–28 (Bankr.W.D.Mo.2004) (*citing Rump v. Rump (In re Rump),* 150 B.R. 450, 454 (Bankr.E.D.Mo.1993)). "Although some courts have found that an award of attorney's fees in a dissolution decree served as maintenance, there is no per se rule to that effect. The courts tend to look at factors such as the disparities in the parties education, training, employment history or earning capacities." *Id.* (citations omitted).

The only evidence before the Court regarding whether or not the obligation is in the nature of support is Niewdach's testimony and the Property Settlement Agreement itself. The characterization of the payment in the Property Settlement Agreement and the context in which the provision appears is not very helpful. It appears as the last paragraph of the agreement and is under its own heading, "Attorney Fees and Costs." It is not listed under the alimony section or the section dividing the parties' debts. The language of the provision does not indicate whether or not the obligation is intended to create a support obligation. Accordingly, the Court must examine evidence of the parties' intent at the time the agreement was reached.

Niewdach testified that once she agreed to divorce Debtor, he quickly agreed to the terms of the Property Settlement Agreement and agreed to pay her legal fees. She testified that she needed him to pay for the divorce as part of her support and to maintain her. Her testimony on this point was supported by her other testimony regarding her poor health, and other evidence indicating a disparity in the parties' incomes at the time of their divorce. In light of this evidence, and finding her testimony to be credible, the Court finds that Niewdach and Tripcony established that the attorney's fees obligation was in the nature of support, and the Debtor offered no credible evidence in rebuttal. Although the Debtor testified that he does not recall this provision at all, and believed it to have possibly been added after the agreement was reached, the Court did not find Debtor credible (as explained in more detail later in this opinion) and did not believe his testimony on this point. Because he basically refused to acknowledge the debt at all, he could not offer any evidence that it was not intended for Niewdach's support. Given the evidence presented, the Court finds that the Debtor's obligation to pay Niewdach's attorney fees was intended to balance the disparity in Niewdach and Debtor's incomes, and to provide Niewdach with the necessary support to insure that her daily needs were met. Accordingly, the attorney fee's obligation is nondischargeable as a support obligation pursuant to § 523(a)(5).

**416**

### B. Non–Support Debts—§ 523(a)(15).

■ Section 523(a)(15) provides that a marital debt not of the kind described in § 523(a)(5) is presumptively nondischargeable unless the debtor can demonstrate that debtor does not have the ability to pay the debt or the benefit to debtor is greater than the detriment to the former spouse. *See generally Fureigh v. Haney (In re Haney)*, 238 B.R. 432 (Bankr. E.D.Ark.1999); *Johnston v. Henson (In re Henson)*, 197 B.R. 299 (Bankr.E.D.Ark. 1996); *Schmitt v. Eubanks (In re Schmitt)*, 197 B.R. 312 (Bankr.W.D.Ark. 1996). It is only the obligation owed to the spouse or former spouse which falls within the scope of § 523(a)(15); in the case of an obligation to pay a debt owed to a third party, it is the obligation to hold the spouse or former spouse harmless that is presumptively nondischargeable under this section. *See* 140 Cong. Rec. H10752, H10770. "A property settlement incorporated by a divorce decree that apportions third party debt to one spouse means that the obligor-spouse indemnifies the obligee-spouse in the event that the obligee is required to pay." *In re Sturdivant*, 289 B.R. at 399 (*citing Johnston v. Henson (In re Henson)*, 197 B.R. 299, 303 (Bankr. E.D.Ark.1996)). This is true even if there is no "hold harmless" language in the decree or complaint. *Johnston* at 303 (interpreting Arkansas law) (*citing Thomas v. Thomas*, 246 Ark. 1126, 443 S.W.2d 534 (Ark.1969); *Gatlin v. Gatlin*, 306 Ark. 146, 811 S.W.2d 761 (Ark.1991); *Merrill Lynch v. First National Bank of Little Rock*, 774 F.2d 909 (8th Cir.1985)).

■ In an adversary proceeding filed pursuant to § 523(a)(15), the nondebtor former spouse must, in the first instance, demonstrate that the debt was incurred in the course of the divorce or later related order (a **"non-support obligation"**). If the nondebtor former spouse

is successful, the burden then shifts to the debtor to demonstrate either that the debtor does not have the ability to pay the debt, or that discharging the debt would result in a benefit to the debtor that outweighs the detrimental consequences to the former spouse. *See Moeder v. Moeder (In re Moeder)*, 220 B.R. 52 (8th Cir. BAP 1998). With regard to these elements, the Court views the parties' circumstances *as of the time of trial,* rather than the date of the divorce or the date of the filing of the bankruptcy petition, in order to fully examine the benefits of the "fresh start" to the debtor, any change in circumstances in employment, and other good or bad fortune which may have befallen the parties. In considering changed events, and particularly the benefits of discharge, the current and future financial circumstances of the parties must be analyzed. *See In re Woods*, 309 B.R. 22 (Bankr.W.D.Mo.2004); *Grunwald v. Beck (In re Beck)*, 298 B.R. 616, 623 (Bankr.W.D.Mo.2003); *Fureigh v. Haney (In re Haney)*, 238 B.R. 432, 435 (Bankr.E.D.Ark.1999).

■ Niewdach submitted a copy of the Divorce Decree and Property Settlement Agreement at the Trial, and Debtor did not dispute that these orders were entered in the course of the parties' divorce. Having determined that the attorney fees obligation is a support obligation, the Court must now determine whether the car, second mortgage, and life insurance obligations are non-support obligations within the scope of § 523(a)(15). In the case of the car obligation, the Debtor was required to purchase a car for Niewdach under the Property Settlement Agreement. This car was in fact purchased and financed by both Niewdach and Debtor. Debtor testified that he made the car payments on his ex-wife's car for a few months but he ceased making these payments after he bought his new car. Niew-

dach's sister is currently helping her make the car payments so that Niewdach may keep the car. Although the Property Settlement Agreement does not include hold harmless language in connection with this obligation, the Debtor is obligated to indemnify Niewdach for the payments she has made under Arkansas law, as discussed above. With respect to the second mortgage obligation, Debtor is responsible for this debt under the Property Settlement Agreement, and in this case, there is specific language requiring Debtor to hold Niewdach harmless with respect to this debt. Accordingly, both of these obligations are owed to Niewdach and were incurred in the course of a divorce, and are therefore presumptively nondischargeable pursuant to § 523(a)(15). The burden of proof thus shifts to Debtor to establish that the Obligations are dischargeable pursuant to the exceptions to nondischargeability found in § 523(a)(15)(A) or (B).

 However, the life insurance obligation which Debtor seeks to discharge is not an obligation owed to Niewdach even though it was created by the Property Settlement Agreement. Niewdach claims no standing with respect to this debt because her daughter Nicole is the beneficiary of the life insurance policy. Nicole was not named a defendant in this action, and did not appear. Nevertheless, her absence is immaterial because third parties, such as Nicole, do not have standing under § 523(a)(15) in any case. *See In re Dollaga,* 260 B.R. 493 (9th Cir. BAP 2001); *In re Euell,* 271 B.R. 388 (Bankr.D.Colo. 2002); *In re Beach,* 203 B.R. 676 (Bankr. N.D.Ill.1997). Debtor may raise the affirmative defense found in § 523(a)(15)(B), which is discussed in more detail below, and as a matter of law, he will prevail where the debt is owed to a third party and his former spouse is not jointly liable for the debt, and will not suffer any detri-

mental consequences. if the debt is not paid. *Id.* This is because Debtor will receive a benefit by not having to pay the debt, but his former spouse will suffer no detriment because she was not liable for the debt in any case, and will not suffer any consequences if it is not paid. Accordingly, the Debtor has met his burden under § 523(a)(15)(B) with respect to the life insurance obligation which is dischargeable, and there is no need to further analyze that debt.

### 1. The Debtor's Ability to Pay.

 To determine a debtor's ability to pay the debts at issue, the court applies a disposable income test, not an undue hardship test. *See In re Beck,* 298 B.R. 616, 623–624 (Bankr.W.D.Mo.2003) *(citing Moeder v. Moeder (In re Moeder),* 220 B.R. 52, 54–55 (8th Cir. BAP 1998) (recognizing that § 523(a)(15)(A) focuses on the debtor's disposable income)) (other citations omitted). Specifically, § 523(a)(15)(A) provides:

> the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

Accordingly, once the court has taken into account a debtor's "reasonably necessary" personal and business expenses, the court must determine if the debtor has enough assets or income sufficient to pay the obligations at issue. *See In re Beck,* 298 B.R. at 623–624 *(citing Stuart v. Koch (In re Koch),* 109 F.3d 1285, 1289 (8th Cir.1997)). In doing so, the court should consider the debtor's entire economic circumstances. *Id.*

■ At the Evidentiary Hearing, Debtor objected to any consideration of his future earnings for purposes of determining whether the Obligations should be discharged. Debtor's counsel cited this Court's pre-trial order for the premise that the Court could consider only the parties' financial circumstances at the time of the Trial, and that accordingly, evidence of his future earnings is irrelevant. In fact, the Court's pre-trial order specifically stated:

In considering changed events, and particularly the benefits of discharge, the current *and future* financial circumstances of the parties must be carefully analyzed. *Dressler v. Dressler (In re Dressler)*, 194 B.R. 290 (Bankr.D.R.I. 1996) (appropriate time to appraise "current circumstances" is trial date); *Taylor v. Taylor (In re Taylor)*, 191 B.R. 760 (Bankr.N.D.Ill.1996).

(Emphasis added.) Debtor's counsel also cited *Dressler* and *Taylor* for this premise yet neither case stands for the proposition that future income may not be considered in determining a debtor's ability to pay, and *Taylor* in fact specifically held that the Debtor there had the ability to pay his obligation in installments with future income. *See Dressler* and *Taylor, supra.* Although these cases do direct the court to examine the parties' financial circumstances as of the trial date rather than the divorce or bankruptcy petition date, the Court is not prevented from examining the parties' future financial circumstances in determining whether the Debtor has the ability to pay the debts at issue over time. The Bankruptcy Court in the Western District of Missouri has adequately explained:

A debtor's present and future circumstances may be examined in determining disposable income for purposes of § 523(a)(15), and the court's inquiry is not limited to the debtor's financial strength at any single moment in time. *See Grunwald v. Beck (In re Beck)*, 298 B.R. 616, 623 (Bankr.W.D.Mo.2003); *Fureigh v. Haney (In re Haney)*, 238 B.R. 432, 435 (Bankr.E.D.Ark.1999) ("The appropriate analysis includes a view of the debtor's future financial situation, including an ability to make minimal monthly payments on the debt, rather than a static view of the debtor's current ability to pay the debt."); *Johnson v. Rappleye (In re Rappleye)*, 210 B.R. 336, 340 (Bankr.W.D.Mo.1997) ("Ability to pay under § 523(a)(15) does not necessarily mean at the time of trial, but requires the Court to consider debtor's future earning capacity." (*citing Florio*, 187 B.R. at 656–658)).

*In re Woods,* 309 B.R. 22, 27–28 (2004). Accordingly, evidence of the Debtor's future earnings is relevant, the Debtor's objection is overruled, and the Court will consider the Debtor's $9,085 salary increase this year, and the possibility that he will receive a similar increase in 2006 and 2007, in determining whether he has the ability to pay the Obligations.

In considering Debtor's entire financial circumstances, the Court has before it evidence of the Debtor's salary at the time of trial along with his most recent salary increase, and the Debtor's testimony regarding his current expenses. In evaluating whether the Debtor has the ability to pay the car and second mortgage obligations, the Court must carefully examine his current expenses to determine if they are reasonable and necessary. However, because the only evidence before the Court regarding Debtor's expenses is his testimony, the Debtor's credibility is central to this determination. Following the Trial, the Court had questions regarding the Debtor's credibility simply based on his demeanor and testimony at Trial—he seemed to conveniently forget everything related to his divorce, and to be recklessly indifferent to his financial circumstances at the time of his divorce and afterwards. He also seemed intent on getting out of

the Property Settlement Agreement that he willingly executed (claiming that he did not read it, and basically never knew anything about it because he did not even realize that he was getting divorced). However, it was only after the Evidentiary Hearing, that it became clear Debtor had in fact deliberately mislead the Court. When the Court held the Evidentiary Hearing regarding Debtor's future income and prior testimony on that point, Debtor contended that his testimony at Trial was not misleading or false. The Court finds otherwise.

The Trial was for the sole purpose of determining whether Debtor could afford to pay the Obligations, and if so, whether it was a greater detriment to him than benefit to his wife for him to pay these debts. The question asked him went to the heart of the Trial. Specifically, Mr. Jacobs asked, "Now would you say that there is a disparity in your incomes?" His answer was that he made $55,000, yet at that time he knew that he would be making $64,000 at the beginning of the next fiscal year—$24,000 more than his ex-wife. Debtor was then asked "Now do you get annual raises?" He answered "no" and continued to explain that the universities were in "big trouble" and that they were not getting any money for raises. This was a patently false and misleading statement. His detailed explanation at the Evidentiary Hearing as to why he answered "no" evidences his intelligence and capacity to understand the issues of the Trial, which in turn evidences an intent to deceive. He could have no misunderstanding of the nature of the question given its context. Yet, he belligerently maintained that he had not been asked the right question—that "raise" meant something specific to him due to its meaning at the university. But as Mr. Choate explained, the term of art "annual raise" would only be understood by people within higher education, and everyone else would consider a

salary increase a raise. In light of Debtor's false and misleading statements, all of his testimony is tainted, and the Court cannot find him a credible witness.

Again, Debtor has the burden to prove he cannot pay the Obligations at issue. Yet, the only evidence of his expenses is his testimony which the Court does not find credible. However, even if Debtor's testimony were credible, Debtor failed to prove that all his listed expenses are both reasonable and necessary. Apart from the alimony Debtor must pay his former spouse, his largest expense is the $500 he allegedly pays his sister to live in a one-room cabin adjacent to his family's property and his former spouse's residence. Debtor produced no evidence to show that this is a reasonable and necessary expense—he did not show that he could not find a less expensive apartment or that he could not move in with his parents. Nor did Debtor prove that he actually paid this amount to his sister. Debtor also alleges that he pays $300 in transportation costs in commuting to Arkadelphia where he works. He claimed that he must live near his parents to help them do work around their property, and because they are in poor health. Yet, no corroborating evidence was produced to show that his parents are in fact in poor health or that they need him to do this work, particularly on a daily basis. Additionally, he does not claim that they pay him for any of this work. Accordingly, Debtor has not shown that it is reasonable and necessary for him to pay $500 per month for a one-room cabin, and $300 per month in transportation costs so that he may live close to his parents and help them free-of-charge.

Debtor also pays $337 per month to drive a brand new vehicle. He produced no evidence to show why this expense is reasonable and necessary. Even if the Court were to assume that he testified truthfully when he claimed that his former

vehicle, the Daewoo (on which there was no debt), could not be fixed, the Debtor failed to show why he needed a brand new $20,000 vehicle as opposed to a more affordable car, *particularly given the fact that he was aware of the obligation to pay for Niewdach's car, when he made the decision to buy a new car. See In re Fellner,* 256 B.R. 898, 904 (8th Cir. BAP 2001) ("The Debtor presented no evidence to suggest that his vehicle expenses were reasonable and necessary, that lesser expensive transportation was unavailable, or that the truck payments would not fall to his parents if he did not make them."). Likewise, Debtor offered no testimony or other proof to show why his telephone expense of $105 per month was reasonable or necessary. Debtor also failed to put forth any proof to show why he had $153 budgeted for miscellaneous expenses, including haircuts, pet expenses and clothes. The Court finds this amount unreasonably high, especially since he already budgeted $85 for clothes.

Taking into account Debtor's additional income for the fiscal 2004–2005 year, and by reducing those expenses that Debtor failed to prove were reasonable or necessary, Debtor has the ability to pay the Obligations. Specifically, he should receive approximately $485 [7] in additional income per month due to his salary increase at the beginning of HSU's fiscal year [8], for a total of approximately $3,776 per month when added to his current income of $3,291.38. Debtors submitted expenses were $3,126 per month, but by reducing those expenses which Debtor failed to prove were reasonable or necessary and eliminating the life insurance expense which is dischargeable, Debtor easily has

enough disposable income to pay the Obligations. Additionally, once Niewdach sells her home, Debtor will be relieved of the obligation to pay the second mortgage on that home (provided there is no deficiency), and accordingly, should have more than $800 in additional income at that time. Moreover, Debtor is likely to continue to make more money in future years; HSU informed Debtor that a $9,085 salary increase was planned for fiscal years 2006 and 2007 if funds were available. For these reasons, the Court finds that Debtor failed to prove that he does not have the ability to pay the Obligations owed to Niewdach.

### 2. *Benefit/Detriment Test.*

█ If the debtor has the ability to pay the obligations at issue, the court must next determine whether the benefit to the debtor outweighs the detriment to the debtor's spouse, former spouse, or child pursuant to § 523(a)(15)(B) which provides an exception to nondischargeability if:

discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor;

In applying the benefit versus detriment analysis, the court must analyze the income and expenses of each party. *In re Brown,* 302 B.R. 637, 645 (Bankr.N.D.Iowa 2003).

█ In examining the income and expenses of each party, it is clear that Niewdach will suffer the greatest detriment if forced to pay the car and second mortgage obligations. According to her testimony, which the Court found credible, she can pay neither her regular expenses nor the

---

7. The Court arrives at this figure by applying the same percentage of take-home pay to gross pay as that reflected on Debtor's current pay stubs to his annual salary increase ($9,085 multiplied by 64% divided by 12).

8. The date on which HSU's fiscal year begins was not put into evidence, but as there are only four months remaining in 2004, it should be relatively soon if it has not occurred already.

Obligations at this time. Her sister is paying her car note, and she is borrowing money from friends and relatives to pay the second mortgage. Even without paying these debts, her other expenses exceed her income by more than $1,000. She is making minimum payments on at least $12,000 of medical bills, and her cancer was not in remission at the time of Trial. She is also incurring credit card debt to pay for her prescriptions. Niewdach also testified that she cut back on unnecessary expenses such as Direct TV and dining out.

In contrast, the Court has already determined that Debtor has the ability to pay both his regular expenses (those which the Court finds are reasonable and necessary), and the Obligations at issue. Additionally, he can expect to have his income continue to rise (the evidence indicated that he should receive an additional $9,085 salary increase each of the next two fiscal years if funds are available), whereas Niewdach has reached the maximum salary level for her position and cannot find better paying work, especially due to her health condition. Including Debtor's most recent salary increase, Debtor makes approximately $70,000 (his $64,831 salary together with $5,000 for freelance work) whereas Niewdach makes $43,600. Even with the $8,400 Debtor pays Niewdach in alimony annually, Niewdach will make at least $10,000 less than Debtor, and that discrepancy will most likely only continue to grow. Debtor should suffer no real detriment in paying the Obligations at issue, and accordingly, receives no benefit other than putting more disposable income in his pocket by discharging these debts. On the other hand, Niewdach will suffer (and has been suffering) a grave detriment in being forced to borrow funds to make these payments. In sum, the Court finds that if the Obligations were discharged, the detriment to Niewdach far outweighs any benefit accruing to the Debtor.

## CONCLUSION

The attorney's fees obligation is a non-dischargeable support debt pursuant to § 523(a)(5). The Debtor's obligation to pay premiums on a life insurance policy on his life with his former step-daughter named beneficiary is dischargeable pursuant to § 523(a)(15)(B) because Debtor's former step-daughter does not have standing to contest Debtor's affirmative defense found in § 523(a)(15)(B). The car and second mortgage obligations are nondischargeable pursuant to § 523(a)(15)(A) and (B) in that Debtor has the ability to pay these debts, and the detriment to his former spouse caused by discharging the debts far outweighs any benefit the Debtor would receive.

A judgment in accordance with this Memorandum Opinion will be entered this date.